LAMAR, Justice,
 

 for the Court:
 

 ¶ 1. Lisa Jo Chamberlin was convicted on two counts of capital murder and sentenced to death. Chamberlin’s conviction and sentence were affirmed by this Court on direct appeal in
 
 Chamberlin v. State,
 
 989 So.2d 320 (Miss.2008),
 
 cert. denied,
 
 — U.S. -, 129 S.Ct. 908, 173 L.Ed.2d 122 (2009).
 

 ¶2. Chamberlin has filed a motion for post-conviction-relief, asking this Court to grant her leave to proceed in the trial court, asserting the following grounds for relief:
 

 I. That she was denied effective assistance of counsel before and during the guilt-innocence phase of her trial.
 

 II. That she was denied effective assistance of counsel before and during the penalty phase of her trial.
 

 III. That the State violated
 
 Brady v. Maryland
 

 [1]
 

 when it failed to produce a letter written by her code-fendant, Roger Gillett, that contradicted the State’s theory that she was the instigator of the crime.
 

 IV. That she will be denied her Eighth Amendment right to be free from cruel and unusual punishment if she is executed by lethal injection, because the current method of lethal injection creates a significant likelihood of a needlessly painful and prolonged death.
 

 After review, we find that Chamberlin’s claims lack merit, and we therefore deny her motion for leave to proceed in the trial court.
 

 ANALYSIS
 

 ¶ 3. This Court has recognized that post-conviction-relief actions have become part of the death-penalty appeal process.
 
 Jackson v. State,
 
 732 So.2d 187, 190 (Miss.1999). The standard of review for capital convictions and sentences is “one of ‘heightened scrutiny’ under which all bona
 
 *1050
 
 fide doubts are resolved in favor of the accused.”
 
 Flowers v. State,
 
 773 So.2d 309, 317 (Miss.2000) (citations omitted). “This Court recognizes that 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.’ ”
 
 Id.
 

 1. Whether Chamberlin was denied effective assistance of counsel before and during the guilt-innocence phase of her trial.
 

 ¶ 4. The test for ineffective assistance of counsel is well-settled. “The benchmark for judging any claim of ineffectiveness must be whether counsel’s conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.”
 
 Strickland v. Washington,
 
 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must first prove that his counsel was deficient, which requires showing that “counsel made errors so serious that [he or she was] not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.”
 
 Id.
 
 at 687, 104 S.Ct. 2052. Secondly, a defendant must prove that the “deficient performance prejudiced the defense,” which requires showing that “counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.”
 
 Id.
 
 Absent both showings, a defendant may not prevail on his claim that his counsel was ineffective.
 
 Id.
 

 ¶ 5. This Court must “ ‘strongly presume that counsel’s conduct falls within a wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy. In other words, defense counsel is presumed competent.’ ”
 
 Liddell v. State,
 
 7 So.3d 217, 219-20 (Miss.2009). And even where professional error is proven, this Court must determine if there is a “reasonable probability that, but for counsel’s unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.”
 
 Mohr v. State,
 
 584 So.2d 426, 430 (Miss.1991).
 

 ¶ 6. Chamberlin alleges that her counsel was deficient in four main areas during the guilt-innocence phase of her trial. She first asserts that her counsel was deficient during jury selection when he failed to rebut the State’s proffered reasons for peremptory strikes, failed to raise a gender-based Batson
 
 [2]
 
 challenge, failed to argue on direct appeal that the trial court’s acceptance of pretextual strikes was plain error, and failed to question jurors to determine whether they were qualified to serve on the jury in spite of their opposition to the death penalty. Second, she asserts that her counsel was deficient when he failed to develop and present evidence regarding her methamphetamine withdrawal and its effect on her during interrogation. Third, she asserts that her counsel was deficient when he failed to introduce evidence that she was dominated by her codefendant, Roger Gillett. Finally, she asserts that her counsel was deficient when he failed to object to the testimony of Vanessa Stringfellow.
 

 A. Jury Selection
 

 ¶ 7. When addressing a
 
 Batson
 
 challenge, a trial court should employ a three-step procedure:
 

 (1) the defendant must make out a pri-ma facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose; (2)
 
 *1051
 
 once the defendant has made out a pri-ma facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible, race-neutral justifications for the strikes; and (3) if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination. The burden remains on the opponent of the strike to show that the race-neutral explanation given is merely a pretext for racial discrimination.
 

 Pruitt v. State,
 
 986 So.2d 940, 942-43 (Miss.2008) (internal citations omitted).
 

 Failure to rebut proffered reasons for strikes against African-Americans
 

 ¶8. During voir dire, the prosecutor used eight of his thirteen peremptory strikes against African Americans.
 
 [3]
 
 Only two African-American jurors ultimately were seated.
 
 [4]
 
 Chamberlin’s defense counsel made a
 
 Batson
 
 challenge. Although the trial judge expressed doubt that defense counsel had met his burden of making a prima facie showing of discrimination,
 
 [5]
 
 he asked for a response from the prosecutor. The prosecutor responded with the various reasons for his strikes of the eight African-American jurors, and the trial judge found that all of the reasons were race-neutral. Chamberlin’s defense counsel requested that he be allowed to rebut the reasons offered by the prosecutor, and the trial judge allowed him to do so.
 

 ¶ 9. Chamberlin argues that, while her defense counsel did request an opportunity to show that the proffered reasons were pretextual, he failed to rebut .the
 
 specific
 
 reasons offered by the prosecutor for four of the eight struck jurors.
 
 [6]
 
 Further, he did not present any argument concerning the remaining four struck jurors.
 

 ¶ 10. In
 
 Puckett v. State,
 
 788 So.2d 752, 763 (Miss.2001), we said:
 

 One of the recognized indicia of pretext is “disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge.”
 
 Mack v. State,
 
 650 So.2d [1289] at 1298 [ (Miss.1994) ]. This Court has explained that while such use of challenges . is a factor which may be considered by the trial court,
 
 where multiple reasons led to the strike of the State to strike one juror, the existence of another juror with one of his or her individual characteristics does not demonstrate that the reasons assigned were pretextual.
 

 (Emphasis added.)
 

 ¶ 11. Chamberlin claims that defense counsel should have performed a comparative jury analysis, which would have demonstrated disparate treatment of the jurors, indicating that the State’s strikes were pretextual. But a thorough review of the record in this case, including the jury questionnaires provided by Cham-berlin, discloses that each of the African-
 
 *1052
 
 American jurors struck had at least one response in his or her jury questionnaire that differentiated him or her from the white jurors who were accepted by the State. Therefore, we are unable to find disparate treatment of the struck jurors. And because we find no disparate treatment and no other evidence of pretext, we cannot say that Chamberlin’s defense counsel was deficient in this stage of the jury-selection process. This issue is without merit.
 

 Failure to make a gender-based Batson challenge
 

 ¶ 12. During voir dire, the prosecutor used nine of his thirteen peremptory strikes against females.
 
 [7]
 
 Chamberlin argues that her defense counsel was deficient because he failed to make a gender-based
 
 Batson
 
 challenge. She argues that her counsel should have been “keenly aware and acutely concerned about a pattern of strikes against prospective jurors of the same gender as his client.” But Chamberlin fails to mention that the final jury composition consisted of eight females, four males, and two female alternates. There is simply no evidence to support a claim of gender-based discrimination. This issue is without merit.
 

 Failure to argue plain error on direct appeal
 

 ¶ 13. Chamberlin argues that her counsel should have asserted on direct appeal that the trial court’s allowance of the prosecutor’s strike against one or more of the African-American jurors was plain error. She asserts that there is a reasonable probability that, had counsel made the comparative-analysis argument to this Court, the outcome would have been different and she would have been entitled to a new trial. We disagree.
 

 ¶ 14. As discussed above, after a thorough review of the record, we find no evidence of pretext in the prosecution’s strikes. Thus, Chamberlin’s counsel’s failure to argue plain error on appeal was not deficient.
 

 Failure to question jurors about their views on the death penalty
 

 ¶ 15. During voir dire, the trial court asked if any members of the venire would be unable to set aside their personal feelings about the death penalty and return a sentence of death if the evidence justified it. Some venire members indicated that they would have a problem setting aside their personal feelings, and the court struck several of them for cause. Cham-berlin argues that her defense counsel was deficient because he “failed to explore with at least some of these venirepersons whether they were actually qualified to serve”—in other words, he failed to “rehabilitate” them after they stated their initial opposition to the death penalty.
 

 ¶ 16. Under
 
 Strickland,
 
 Cham-berlin must show that the failure to attempt to “rehabilitate” these venire members resulted in error so serious as to deprive her of a fair trial and reliable result.
 
 Strickland,
 
 466 U.S. at 687, 104 S.Ct. 2052. This Court clearly has stated that a juror may be challenged for cause based on his views about capital punishment when “
 
 ‘those views would substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’
 
 ”
 
 Evans v. State,
 
 725 So.2d 613, 656 (Miss.1997) (citations omitted) (emphasis added). As mentioned above, several of the venire members cited
 
 *1053
 
 by Chamberlin clearly indicated that their feelings about the death penalty were so strong that they would not be able to set them aside. Chamberlin’s bare allegations that she ended up with a “hanging jury” do not suffice. This issue is without merit.
 

 B. Failure to Develop Evidence Regarding Effect of Methamphetamine Withdrawal and Interrogation Techniques
 

 ¶ 17. Chamberlin argues that her defense counsel knew that she had been abusing methamphetamine at the time of her arrest, and that he should have consulted an expert about the possible effects of her methamphetamine addiction and withdrawal on the voluntariness of her confessions. Further, she argues that counsel erred in not consulting an expert or presenting evidence about the effects of police interrogation techniques on her demeanor in her videotaped statements.
 

 ¶ 18. On direct appeal, this Court thoroughly examined the voluntariness and admissibility of Chamberlin’s statements to police and found no error.
 
 See Chamberlin,
 
 989 So.2d at 330-36. Thus, we cannot say that Chamberlin’s counsel was deficient for failing to consult an expert about the possible effects of her methamphetamine addiction. Additionally, Chamberlin has failed to show how she was prejudiced by the lack of evidence of the possible effects of her methamphetamine addiction, and we cannot say that such evidence deprived Chamberlin of a fair trial or produced an unreliable result.
 

 C. Failure to Introduce Evidence that Chamberlin was Dominated by Gil-lett
 

 ¶ 19. Chamberlin argues that her defense counsel should have presented evidence that she was dominated by her code-fendant, Roger Gillett — that she “was a follower, not a leader.” Further, she argues that her counsel could have presented evidence that her intelligence is well below average and that she suffers from memory impairment.
 

 ¶ 20. We disagree with Chamberlin’s claims that, had her defense counsel elicited this testimony, there is a reasonable probability that the jury would have come to a different conclusion. Chamberlin confessed numerous times and to several people, but never stated that Gillett made her do anything, or that she was in fear of him for any reason. From our review of the record, it does not appear that Chamberlain was “dominated” by anyone, but rather was a willing participant in the robbery and murder of the two victims.
 

 ¶ 21. Moreover, the decision whether to introduce evidence — if any existed — that Chamberlin was dominated by Gillett falls directly into the ambit of trial strategy.
 
 See Cole v. State,
 
 666 So.2d 767, 777 (Miss.1995) (“Complaints concerning counsel’s failure to file certain motions, call certain witnesses, ask certain questions, and make certain objections fall within the ambit of trial strategy.”). And this Court has clearly stated that there is a strong presumption that counsel’s trial strategy was sound. “‘In considering a claim of ineffective assistance of counsel, an appellate court must strongly presume that counsel’s conduct falls within a wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy. In other words, defense counsel is presumed competent.’ ”
 
 Liddell v. State,
 
 7 So.3d 217, 219-20 (Miss.2009) (citation omitted). Thus, we find this issue is without merit.
 

 D.Failure to Object to the Testimony of Vanessa Stringfellow
 

 ¶22. Vanessa Stringfellow was incarcerated in the Forrest County Jail with
 
 *1054
 
 Chamberlin for a short time. She testified that she had overheard Chamberlin say that “after [she and Gillett] cut [the male victim’s] throat, we propped him up on the couch, and his head was hanging to one side, and we proceeded to have sex in front of the corpse and it was the greatest sex that [we] had ever had and it was an extreme adrenaline rush.” Later, in closing arguments, the prosecutor asked the jury to give Chamberlin an “adrenaline rush.”
 

 ¶ 23. Chamberlin asserts that defense counsel was deficient because he failed to object to Stringfellow’s prejudicial testimony. This assertion is incorrect. Chamber-lin’s defense counsel filed a motion in li-mine to exclude any statements made by Chamberlin to “fellow inmates,” but the trial court denied the motion. Thus, Chamberlin’s defense counsel was not deficient for failing to object to Stringfellow’s testimony, as he attempted to exclude her testimony before trial began.
 

 ¶ 24. We find that all of Chamberlin’s claims regarding ineffective assistance of counsel during the guilt phase are without merit. Chamberlin has failed to show error on the part of her trial counsel, nor has she shown a reasonable probability that the results of the trial would have been different but for the allegations of error.
 

 II. Whether Chamberlin was denied effective assistance of counsel before and during the penalty phase.
 

 ¶ 25. Chamberlin argues that her trial counsel was deficient before and during the penalty phase of her trial, because he conducted only a minimal investigation of her background in search of mitigating evidence. Chamberlin argues that, if all the evidence and additional witnesses found during post-conviction investigation had been presented, there was a reasonable probability of a different outcome at the penalty phase.
 

 ¶ 26. “To assess the probability [of a different outcome under
 
 Strick
 
 land], we consider the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding — and reweigh it against the evidence in aggravation.”
 
 Sears v. Upton,
 
 — U.S. -, 130 S.Ct. 3259, 3266, 177 L.Ed.2d 1025 (2010). The United States Supreme Court has stated that there “is no prejudice when the new mitigating evidence ‘would barely have altered the sentencing profile presented’ to the decisionmaker....”
 
 Id.
 
 at 3266.
 

 ¶ 27. During sentencing, the jury heard testimony from defense expert Dr. Beverly Smallwood
 
 [8]
 
 of the sexual and physical abuse in Chamberlin’s family — by her mother, her half-brother, her biological father, her stepfather and a fourth-grade teacher. The jury heard that Chamber-lin’s mother had bipolar disorder, was a severe alcoholic, and was physically abusive. The jury heard that Chamberlin frequently engaged in abusive relationships with men and that she was often used and abused by men whom she dated. Specifically, the jury heard that Roger Gillett had even tried to drown Chamberlin, and that her reaction was to try to make him feel better about his actions. The jury heard about Chamberlin’s severe drug addiction, and that she had started drinking at age
 
 *1055
 
 twelve and using methamphetamine at age thirteen. The jury heard that Chamberlin had post-traumatic stress disorder, and that she met the criteria for borderline personality disorder.
 

 ¶ 28. After detailing and providing numerous examples of Chamberlin’s behavior in relation to the problems mentioned above, Dr. Beverly Smallwood stated the following regarding the day of the murders:
 

 I guess the way I would sum it up is as an accumulative effect and growing mental and emotional disturbance on the day that these crimes were committed and the days thereafter. This isn’t a very clinical term, but I’ll just say it this way and I think we’ll all understand it. Lisa was a psychological mess. And it had grown starting in her early childhood with things that she couldn’t help but then choices that she made over time and not having the tools, having never had role models or a support system and having not taken some of the opportunities she did have. When she got to that day, the day that these crimes were committed, she was a life spun out of control.
 

 ¶ 29. Dr. Smallwood also testified that, when Chamberlin was not on drugs and not involved in abusive relationships, she “did not see a person who is interpersonally callous.” Dr. Smallwood testified that some of Chamberlin’s most fulfilling times were when she was “working in helping roles,” like during her employment at a nursing home and as a private caregiver where she “attended to [those] people with love and care” and was “well-liked.” Dr. Smallwood also gave examples of Cham-berlin’s recent incarceration during which she devoted her time to helping other inmates and jailers. Finally, Dr. Smallwood testified that, if Chamberlin were sentenced to life without parole, she would “take advantage of the opportunities that were in prison to continue to grow herself as well as then to essentially serve as a warning to others and to help them along the way.”
 

 ¶ 30. The mitigation evidence presented to this Court in Chamberlin’s post-conviction petition is essentially the same as the testimony presented during the penalty phase. While it is true that the mitigation evidence uncovered during post-conviction investigation is more detailed than that presented at trial, the jury was made aware of all of the abuse and addiction in Chamberlin’s life. We cannot say that Chamberlin was prejudiced, as the additional mitigating evidence would, if anything, “ ‘barely have altered the sentencing profile presented’ to the decisionmaker....’ ”
 
 Sears,
 
 130 S.Ct. at 3266.
 

 III. Whether the State violated
 
 Brady v. Maryland
 
 when it failed to produce a letter written by Chamber-lin’s codefendant, Roger Gillett.
 

 ¶ 31. Chamberlin argues that the prosecution’s failure to disclose a “favorable” letter written by Roger Gillett violated the rule pronounced in
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In
 
 Brady,
 
 the United States Supreme Court held that “the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.”
 
 Id.
 
 at 87, 83 S.Ct. 1194. To prove a
 
 Brady
 
 violation, a defendant must show, among other things, that “had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.”
 
 Thorson v. State,
 
 994 So.2d 707, 720 (Miss.2007).
 

 
 *1056
 
 ¶ 32. Gillett’s letter contained the following language that Chamberlin asserts is exculpatory:
 

 I believe this is a blessing in disguise ... I don’t pass on any blame and am not sad about my situation. The burden I have put on the ones I love is the only part I regret but the burden is a constant reminder of my families [sic] love for me. Not so much directly but by the way you treat Lisa. Although we know its [sic] to keep her from burning me but in the process of self-preservation to keep her from burning herself as well. If she keeps quiet and takes no deals we will be set free.
 

 ¶ 33. We question Chamberlin’s claim that this letter is exculpatory. Although she argues that it would have contradicted the prosecution’s theory that she was the instigator of the crime, it seems, at best, to show merely that Gillett wanted her to remain silent about the crime. But more importantly, we find that overwhelming evidence existed to support the jury’s verdict, and the introduction of this vague letter was highly unlikely to affect the outcome. Thus, we find no “reasonable probability” that, had the letter been introduced, the outcome would have been different.
 

 IV. Whether Chamberlin will be denied her Eighth Amendment right to be free from cruel and unusual punishment if she is executed by lethal injection.
 

 ¶ 34. Chamberlin failed to make any argument regarding the method of execution on direct appeal, and, therefore, the claim is barred.
 
 See Spicer v. State,
 
 973 So.2d 184, 206 (Miss.2007) (“It is Spi-cer’s contention that execution by lethal injection constitutes crael and unusual punishment. This is the first time Spicer has raised this issue, and it was capable of being raised on direct appeal. The issue is now procedurally barred from further consideration on collateral appeal.”).
 
 But see Bennett v. State,
 
 990 So.2d 155, 160 (Miss.2008) (“Bennett next argues that death by lethal injection violates his First- and Eighth-Amendment rights under the U.S. Constitution. Although Bennett failed to raise this issue on direct appeal, we do not hold that it is procedurally barred from further review on collateral appeal.”).
 

 ¶ 35. Procedural bar notwithstanding, this Court already has addressed this issue on the merits and held unequivocally that Mississippi’s method of lethal injection does not violate the Eighth Amendment. In
 
 Bennett v. State,
 
 990 So.2d 155 (Miss.2008), this Court stated:
 

 If differences exist between Mississippi’s execution protocols and those used in Kentucky, then, the inquiry is whether Mississippi’s lethal-injection protocol meets Constitutional muster in light of this recent Supreme Court decision. The Fifth Circuit, when considering inmate Dale Leo Bishop’s Eighth-Amendment challenge to Mississippi’s lethal-injection procedures, recently announced that “Mississippi’s lethal injection protocol appears to be substantially similar to Kentucky’s protocol that was examined in
 
 Baze [v. Rees,
 
 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) ].”
 
 Walker v. Epps,
 
 2008 WL 2796878 at *3, 2008 U.S.App. LEXIS 15547 at *3 (5th Cir. Miss. July 21, 2008). We agree with the Fifth Circuit’s analysis, and hold that Bennett’s Eighth Amendment challenge to the lethal injection protocol in Mississippi is without merit.
 

 Bennett,
 
 990 So.2d at 161.
 
 See also Goff v. State, 14
 
 So.3d 625, 665 (Miss.2009) (“Goffs claim that Mississippi’s method of inflicting death by lethal injection constitutes cruel and unusual punishment was dispositively rejected in favor of the State
 
 *1057
 
 by the United States Supreme Court’s holding in
 
 Baze v. Rees
 
 and by this Court’s holding in
 
 Bennett v. State.”).
 

 CONCLUSION
 

 ¶ 36. Based on the foregoing, we find that Chamberlin’s claims lack merit, and her motion for leave to proceed in the trial court is denied.
 

 ¶ 37. PETITION FOR POST-CONVICTION RELIEF DENIED.
 

 WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, RANDOLPH, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.
 

 [1]
 

 .
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 

 [2]
 

 .
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69(1986).
 

 [3]
 

 . The prosecutor used seven of his twelve peremptory strikes against African-American venire members, and he used his only peremptory strike during the selection of alternate jurors against an African American.
 

 [4]
 

 . We note that the State tendered a total of four potential African-American jurors, two of whom the defendant struck.
 
 See Chamberlin,
 
 989 So.2d at 339.
 

 [5]
 

 . The trial judge stated: "Due to the make-up of the panel, I’m not confident that the defense has made the prima facie case, has met [its] initial burden...."
 

 [6]
 

 . Defense counsel’s rebuttal consisted of statements such as "this is a man who ... struck me as being someone who would be a very appropriate juror.” He did not attempt to counter the specific reasons offered by the prosecutor.
 

 [7]
 

 . The prosecutor used eight of his twelve peremptory strikes against female venire members, and he used his only peremptory strike during the selection of alternate jurors against a female.
 

 [8]
 

 . Dr. Smallwood was appointed by the trial court to "investigate any factors in Lisa Jo Chamberlin's life or in her psychological or mental or emotional state that might relate to mitigation in understanding her mental state and how she got there, anything relating to mitigation in this case.” Dr. Smallwood testified that she conducted more than twenty hours of clinical interviews with Chamberlin, performed psychological tests and interviewed several collateral witnesses during the course of her evaluation.