IRVING, P.J.,
 

 for the Court:
 

 ¶ 1. Kendrick Lamar Williams was convicted in the Pike County Circuit Court of armed robbery and aggravated assault. The circuit court sentenced him to life and twenty years, respectively, with the sentences to be served concurrently in the
 
 *1167
 
 custody of the Mississippi Department of Corrections. Feeling aggrieved by his convictions, Williams appeals and alleges the following as error: (1) the refusal of a challenge for cause of a juror; (2) the State’s use of testimony that Williams’s codefendants had pleaded guilty and trial counsel’s failure to object to that testimony; (3) the State’s use of an extraneous bad act and trial counsel’s failure to object to that evidence; (4) the State’s use of a witness’s prior statement and trial counsel’s failure to object to the statement or request a limiting instruction; (5) prosecu-torial misconduct and trial counsel’s failure to object to the prosecutor’s remarks; (6) the circuit court’s refusal of a defense jury instruction on the credibility of accessories; and (7) cumulative error.
 

 ¶ 2. Finding no reversible error, we affirm the circuit court’s judgment.
 

 FACTS
 

 ¶ 3. Detective Jeff Honea, with the Pike County Sheriffs Department, testified that he was working as an investigator on April 11, 2009, when he received a call about a shooting at Club Tatiyana on Highway 48 in Pike County, Mississippi. Once on the scene, Detective Honea learned that Eddie Lewis, the owner of Club Tatiyana, had been shot at and robbed. After speaking to Lewis and other individuals, Detective Honea came to the conclusion that Williams was the perpetrator. Detective Honea eventually questioned Williams, who admitted being at Club Tatiyana on the night of the shooting. Williams told Detective Honea that there were three people with him on the night of the shooting: Aris Joseph, Jodenzo Thompson, and Deidre Bonds. Detective Honea testified that Joseph, Bonds, and Thompson were charged as accessories after the fact because they were aware that Williams had shot Lewis and then helped him flee the scene of the crime. During cross-examination, Detective Honea stated that he had difficulty establishing an exact timeline of the shooting, as different witnesses recalled events happening at different times.
 

 ¶ 4. Thompson testified that he and Williams were at Club Tatiyana to shoot dice. Thompson indicated that Joseph and Bonds were at the club but that they were not shooting dice. Thompson testified that Williams began losing money and as a result, had a heated exchange with Lewis. Thompson explained that Lewis was the owner of the club and was “housing the game,” rather than playing dice. Thompson testified that he, Williams, Bonds, and Joseph left the club at approximately 2:00 a.m. At that time, Lewis was the only person left in the club. Thompson stated that Williams was still angry and was complaining about losing money as they drove away from the club. Thompson testified that they had just pulled out of the club’s parking lot when Williams asked Bonds, who was driving, if she could stop the vehicle and open the trunk. Bonds stopped, and Williams exited the vehicle. Williams then retrieved something from the trunk; moments later, Thompson observed Williams run toward the club, and he then heard gunshots. Shortly after hearing two gunshots, Thompson watched Lewis run across the street, away from the club. Thompson testified that Williams reentered the vehicle soon after that. Thompson observed that Williams had a pistol; Williams told the occupants of the car that he had been trying to get money from Lewis but that his gun had jammed, and Lewis had fled. Williams asked Bonds to drive away, and Bonds complied. Joseph also testified at trial, and his testimony was largely consistent with Thompson’s testimony.
 

 ¶ 5. After Thompson and Joseph testified, Lewis took the stand and described
 
 *1168
 
 the shooting and robbery to the jury. Lewis testified that he observed Williams playing dice on the night of the shooting. When Lewis noticed that Williams was losing money and having arguments, Lewis approached him and said, “if you came here with your diaper money, you shouldn’t have came [sic] here.” Lewis testified that he said this to Williams in an effort to calm Williams. Except for speaking to Williams, Lewis’s recitation of events was consistent with that of Thompson and Joseph.
 

 ¶ 6. Lewis testified that he was locking the front door to his club when he heard someone ask what time it was. Lewis looked up and saw Williams standing near him. Lewis then testified about what happened next:
 

 [LEWIS]: Well, as he came up to me, he had just like a bandana over his mouth, like.
 

 * * *
 

 [PROSECUTOR]: So, whenever the defendant came up to you, again, what did he say to you?
 

 [LEWIS]: He said, you know[,] what time it is, you know what time it is. He said that at least three times or more, you know. You know what I’m saying. He said, give it up, you know. You know what time it is, give it up.
 

 [PROSECUTOR]: And what did he mean when he said give it up?
 

 [LEWIS]: He was talking about money. He was talking about money.
 

 [PROSECUTOR]: Okay. What did he have in his hand?
 

 [LEWIS]: When he came toward— when he came around the corner of the building, all I could see was the bandana over his face[,] and I just saw him holding his hand up in the air like this. It looked like a black gun, you know. I can’t tell what model or anything like that. But it was a gun, you know.
 

 [[Image here]]
 

 [PROSECUTOR]: What happened— again, what happened after he — what did he do then, after he pointed the gun at you and demanded the money?
 

 [LEWIS]: He kept demanding the money and saying, you know what time it is, give it up, give it up. And, like I say, you know, it was cursing ... that type of stuff, you know, all that tough boy stuff, you know. But I was just kind of in a daze still, you know.
 

 So I looked at my left hand like this. With my right hand, as he steady standing [sic], I just slowly put my hand in my pocket. I had, you know, I had over $1,000 in my pocket that night. So I had some money in my pocket. He didn’t know how much I had. He just knew I had some money, you know. And so I was just debating, you know, what should I do, you know, thinking about my kids still.
 

 So what I do, I go in my pocket, hand still in the air like this, put my right hand in my pocket. I was saying to myself, should I give him all my money or part of my money, you know what I’m saying? And then I thought about my little boy, not born. And I just say, you know what, I’m just going to give it all to him. And as I was bringing my hand out my pocket [sic], I had just a wad of money like this. And I did like this. And I’m standing straight up[,] and Pm just kind of handing it to him, showing him I’m not about to try to try [sic] anything, you know, reach for a gun or nothing.
 

 And as I’m going like this to hand it to him, standing straight up, I hear a gun fire. I look. I look down, and I
 
 *1169
 
 don’t see any blood. It looked like he had shot like the lower part of ”my body.
 

 So when he did that, I was like, I know it’s not a dream, but he’s meaning to kill me. So I reached [sic] my money back like this. And I was ready to die then. I put my money back in my pocket, looked him dead in the eyes, like eyeball to eyeball, in his eyes, hands still in the air. And I said, look ... you going to have to kill me now. ‘Cause I looked him dead in his eyes[,] and I meant that. Because I felt like he meant me for dead anyway.
 

 [[Image here]]
 

 When I said that, he reached the gun up and had it level with my head. My hand still in the air like this. I’m looking him dead in the eyes, telling him this. I looked down the barrel. After I looked down the barrel, I look[ed] at his finger. And we looking, talking about eye to eye, like I’m looking you dead in your eye, just like looking at you like this, like, you got to kill me. And he didn’t flinch. He just pulled the trigger. I’m looking down the barrel. And I just knew I was dead. But the gun jammed.
 

 * * *
 

 When the gun jammed — I’m a lot bigger than him, I wasn’t scared of him when it jammed. But I’m thinking about my kids, I’m thinking about, the gun jammed. I’m looking down the barrel. I said to myself, all right, if I run towards him, I’m sure I can tackle him. And then I said, if I do run towards him, the gun might unjam and shoot me in the stomach or something like that[,] and I could die, whatever, whatever. So then I said, if I run, he can run after me. So this all going through my head like this, like quick. So I just decided to run.
 

 [[Image here]]
 

 When I decided to run, the gun, he was still trying to face it towards me, when I was standing there. ‘Cause I was — just thought I was dead. I just knew I was dead because I was just there, you know. And then when I kind of came back in, I saw him wrestling with the gun. So it was like he was trying to point the gun at me to unjam it. But he had to hold it at a angle [sic] because when your gun jam [sic], you can’t, you know, he [was] just playing with it.
 

 So I was like, should I rush him or run. So I ran. When I ran, when I hit the corner of my girl’s car, I heard another gun fire, you know what I’m saying. And I ran like at a angle [sic] from the corner of the club, towards the highway. I just heard a gunshot. I’m just running. Adrenaline pumping, you know, and I just ran across the highway.
 

 [PROSECUTOR]: Okay. So after you started running, he fired at you again.
 

 [LEWIS]: Again.
 

 [PROSECUTOR]: Do you know how many times?
 

 [LEWIS]: As I recall, I heard the gun shoot three times. First, when he shot towards my lower body. Second, when I hit the corner of the club, past my girl’s car. The third, I ran across the street to the neighbor’s trailer[,] and I heard it shoot again. I’m running, he’s running. I look behind me — I’m half[-]way to the neighbor’s yard. He’s ... crossed the street. When I get to the door, I’m just banging like crazy, open the door up, open the door up, just going crazy, nuts. He’s running. He gets [halfway] to
 
 *1170
 
 the yard — his little group of people that’s with him, they up [sic] the road. And I could see the car. They hit the car. I see the brake lights and stuff. And I’m like, come on, come on. And he [is] coming closer towards me. I’m just banging on the door. The boy that I thought it was — I didn’t know it was him back there, but the porch light came on. When the porch light come [sic] on, he was [halfway] to the yard[,] and I was up on top of the stairs. So I guess he figured somebody [was] going to see him. And they hollering, come on, come on.
 

 On cross-examination, Lewis was questioned extensively about whether he was certain that it was Williams who had robbed him; he consistently identified Williams as the perpetrator.
 

 ¶ 7. Williams called Bonds and Officer Gregory Patterson as his sole witnesses. Bonds’s testimony was relatively short but was largely consistent with Thompson’s and Joseph’s testimonies. Officer Patterson made the initial contact with Lewis after the robbery. Officer Patterson testified that his offense report listed Thompson as a potential suspect and that Lewis had given him Thompson’s name. During cross-examination, Officer Patterson admitted that he could not remember whether Lewis told him that Thompson was the alleged robber or whether Lewis stated that he had simply observed Thompson with the robber.
 

 ¶ 8. Additional facts will be related, as necessary, during our analysis and discussion of the issues.
 

 ANALYSIS AND DISCUSSION OF THE ISSUES
 

 1. Juror Challenge
 

 ¶ 9. In this contention of error, Williams alleges that the circuit court erred in allowing a certain juror to sit on the jury. However, the record reflects that the juror in question was not seated on the jury, as Williams acknowledges in his reply brief. This contention of error is without merit.
 

 2. Codefendants’Guilty Pleas
 

 ¶ 10. Williams contends that the State erred in eliciting testimony regarding the guilty pleas that Joseph, Thompson, and Bonds entered. Williams is correct that evidence that a codefendant pleaded guilty to the same crime as a defendant is generally inadmissible.
 
 Buckley v. State,
 
 223 So.2d 524, 528 (Miss.1969).
 

 ¶ 11. Several factors undermine Williams’s claim of reversible error in this case. First, the testimony in question was not objected to by Williams at trial. In general, issues that were not raised at trial are barred from our consideration on appeal.
 
 Gunn v. State,
 
 56 So.3d 568, 572 (¶ 17) (Miss.2011). However, Williams will still be entitled to relief if he can show that any of his complaints rise to the level of plain error.
 
 Blanchard v. State,
 
 55 So.3d 1074, 1077 (¶ 16) (Miss.2011). “Plain error exists where such error affects the defendant’s substantive/fundamental rights, even though no objection was made at trial.”
 
 Parker v. State,
 
 30 So.3d 1222, 1227 (¶ 14) (Miss.2010).
 

 ¶ 12. Significantly, Joseph, Bonds, and Thompson all testified at trial; therefore, Williams had the opportunity to question them regarding their guilty pleas and possible motivations for pleading. This Court has suggested that a defendant’s opportunity to question codefendants regarding their guilty pleas weighs against a finding of error regarding the admission of evidence regarding those same guilty pleas.
 
 Palm v. State,
 
 724 So.2d 424, 426 (¶4) (Miss.Ct.App.1998). Furthermore, Joseph, Bonds, and Thompson all testified regard
 
 *1171
 
 ing their involvement in Williams’s crime. In
 
 White v. State,
 
 616 So.2d 304, 308-09 (Miss.1993), the Mississippi Supreme Court found no reversible error where a codefendant testified about his involvement in the crime and evidence of the same codefendant’s guilty plea was introduced at trial. As the
 
 White
 
 court stated: “the question of [the codefendant’s] guilt was not a disputed fact at the trial.”
 
 Id.
 
 at 308. Finally, Joseph’s, Bonds’s, and Thompson’s pleas were based on conduct completely separate from Williams, inasmuch as the three were convicted for assisting Williams in escaping, while Williams was convicted of armed robbery and aggravated assault. In
 
 Brown v. State,
 
 37 So.3d 1205, 1212-13 (¶ 18) (Miss.Ct.App.2009) (quoting
 
 White,
 
 616 So.2d at 307), this Court declined to reverse a defendant’s conviction despite the prosecution’s references to a codefendant’s plea, in part because the plea in that case was “based on conduct not involving the defendant. ...”
 

 ¶ 13. In short, this issue is procedurally barred because it was not raised below and does not rise to the level of plain error. Williams’s codefendants were available for questioning, they testified about their involvement in the crime, and the factual basis for their pleas was different from the factual basis of Williams’s crime.
 

 ¶ 14. This contention of error is without merit.
 

 3. Failure to Object to Evidence Regarding Guilty Pleas
 

 ¶ 15. Williams complains that his trial counsel failed to object to the evidence regarding Joseph’s, Bonds’s, and Thompson’s guilty pleas. To prove ineffective assistance of counsel, Williams must show that his trial counsel was deficient in his performance and that that deficiency somehow prejudiced Williams’s defense.
 
 Sea v. State,
 
 49 So.3d 614, 617 (¶ 12) (Miss.2010). In order for an appellate court to reverse, there must be a “reasonable probability that, but for counsel’s unprofessional errors, the result of the proceedings would have been different.”
 
 Chamberlin v. State,
 
 55 So.3d 1046, 1050 (¶ 5) (Miss.2010) (quoting
 
 Mohr v. State,
 
 584 So.2d 426, 430 (Miss.1991)).
 

 ¶ 16. Since Joseph, Bonds, and Thompson all testified regarding their involvement in the crime, the evidence regarding their guilty pleas was of much less impact than it would have otherwise been. Furthermore, the evidence of Williams’s guilt was overwhelming and included eyewitness testimony from Lewis, Williams’s victim. As in
 
 Palm,
 
 we cannot find that “the outcome in this case would have been different” if Williams’s attorney had objected at trial.
 

 ¶ 17. Accordingly, this contention of error is without merit.
 

 J.
 
 Admission of Other Bad Acts
 

 ¶ 18. Williams next complains of the admission of testimony by Lewis that he encountered Williams after the robbery. Lewis testified that he saw Williams at a truck stop after the robbery, that Williams tapped him on the shoulder, and that Williams stated that he was out of jail because “the courts know [he] told the truth.” Lewis testified that, after the encounter at the truck stop, he started carrying a pistol with him everywhere he went. After Lewis finished describing the encounter, the prosecutor asked the following questions:
 

 Q. All right. But, again, but you’re certain that is the same person that robbed you.
 

 A. I’m positive.
 

 Q. And the same person that’s here in the courtroom—
 

 
 *1172
 
 A. I’m positive....
 

 Williams did not object to Lewis’s testimony at trial. Accordingly, he must show plain error in order to succeed on this issue.
 

 ¶ 19. The testimony here was apparently elicited to show that Lewis had correctly identified Williams as his assailant. While evidence of extraneous bad acts is generally inadmissible, Rule 404(b) of the Mississippi Rules of Evidence allows such evidence if it is offered to show something other than the defendant’s guilt, such as proof of identity. After Lewis finished describing the incident to the jury, the prosecutor immediately questioned Lewis regarding his identification of Williams in light of the incident.
 

 ¶ 20. This contention of error is procedurally barred for failure to raise it at trial. Even if it were not procedurally barred, it is without merit.
 

 5. Failure to Object to Evidence of Other Bad Act
 

 ¶ 21. Williams alleges that his trial counsel was deficient because he failed to object to Lewis’s testimony regarding the incident at the truck stop. As we have already noted, the testimony in question was apparently elicited to show that Lewis had correctly identified Williams. Furthermore, there is no reasonable probability that the outcome of Williams’s trial would have been different without the testimony, given the overwhelming weight of the evidence against Williams.
 

 ¶ 22. This contention of error is without merit.
 

 6. Lewis’s Prior Statement
 

 ¶23. Williams next alleges that the circuit court erred in allowing the State to introduce a prior unsworn statement by Lewis into evidence. There was no objection at trial regarding the statement’s admission into evidence.
 

 ¶ 24. As with Williams’s other issues, this issue is procedurally barred due to Williams’s failure to make a contemporaneous objection. Procedural bar notwithstanding, we note that Lewis’s prior statement was cumulative and repetitive of his testimony at trial. Given the overwhelming weight of the evidence against Williams, we would find no reversible error on this issue even in the absence of a procedural bar.
 

 7. Failure to Object to Prior Statement
 

 ¶ 25. Williams alleges that his trial counsel was ineffective for failing to object to the admission into evidence of Lewis’s prior unsworn statement. Given the cumulative nature of the statement, we cannot find that the outcome of Williams’s trial would have been any different if the statement had not been admitted.
 

 ¶ 26. Accordingly, this contention of error is without merit.
 

 8. Prosecutorial Misconduct
 

 ¶ 27. As a part of his final closing argument, the prosecutor stated the following:
 

 Ladies and gentlemen, what you’re going to tell your family and your friends is that you did your job and your duty as citizens of Pike County, Mississippi, when you convicted this man for shooting at, robbing—committing armed robbery and committing aggravated assault on Eddie Lewis on April 11.
 

 There is—he wants to know if it adds up, ladies and gentlemen. It adds up. Williams contends that these remarks constitute prosecutorial misconduct sufficient to require a reversal of his case. There was no objection to the statement, and Williams’s argument is consequently pro-
 
 *1173
 
 eedurally barred. Regardless of the procedural bar, Williams’s contention is without merit.
 

 ¶ 28. While arguments similar to the one above have been held to be improper in some cases, we do not consider closing arguments in a vacuum. Rather, we must view the prosecutor’s remarks “in conjunction with the ‘opening salvo’ from defense counsel.”
 
 Spicer v. State,
 
 921 So.2d 292, 323 (¶ 70) (Miss.2006) (quoting
 
 Edwards v. State,
 
 737 So.2d 275, 299 (¶ 52) (Miss.1999)). The
 
 Spicer
 
 court found no reversible error where the prosecutor’s remarks were made wholly in response to defense counsel’s closing argument.
 
 Id.
 
 at 322-24 (¶ ¶ 66-71).
 

 ¶29. Here, Williams’s attorney stated the following to the jury during closing argument: “And when you go home, you’re going to talk to your friends and family, and they’re going to say, why did you find him not guilty. And do you know what you’ll say? You’ll say, well, the case didn’t add up. I still have questions.” Viewed in context, the prosecutor was merely responding to Williams’s attorney’s remarks during closing argument. Therefore, notwithstanding the procedural bar, we find that no error flowed from the remarks.
 

 ¶ 30. This contention of error is also without merit.
 

 9.Failure to Object to Prosecutor’s Remarks
 

 ¶ 31. Williams complains that his attorney failed to object to the remarks made by the prosecutor during closing argument. As we have already stated, the remarks were a proper comment on the statements made by Williams’s attorney during closing argument. Williams’s trial attorney did not have a basis for objecting to the remarks after inviting them.
 

 ¶ 32. This contention of error is without merit.
 

 10. Proposed Jury Instruction
 

 ¶ 33. Williams claims that the circuit court improperly refused his proposed jury instruction on the credibility of accessories. In his appellate brief, Williams acknowledges that a defendant is entitled to such an instruction only “when the accomplice’s testimony is the sole basis for conviction, and the defendant’s guilt is not clearly proven.”
 
 Williams v. State,
 
 32 So.3d 486, 490 (1112) (Miss.2010) (citing
 
 Wheeler v. State,
 
 560 So.2d 171, 173 (Miss.1990)).
 

 ¶ 34. We note at the outset that Joseph, Bonds, and Thompson were accessories after the fact, not accomplices. Defendants are not entitled to cautionary instructions regarding the testimonies of accessories after the fact.
 
 Slaughter v. State,
 
 815 So.2d 1122, 1135 (¶ 68) (Miss.2002). Furthermore, even if Thompson, Bonds, and Joseph were viewed as accessories, their testimonies were substantially corroborated by Lewis, who testified that it was Williams who robbed and shot at him. Under these circumstances, the circuit court was correct in refusing Williams’s proposed instruction.
 

 ¶ 35. This contention of error is without merit.
 

 11. Cumulative Error
 

 ¶ 36. Finally, Williams contends that the effect of cumulative errors requires the reversal of his case for a new trial. The Mississippi Supreme Court has stated the following regarding cumulative error:
 

 Under the cumulative-error doctrine, individual harmless errors may be aggregated with other errors to create reversible error “where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial.”
 
 Ross v. State,
 
 
 *1174
 
 954 So.2d 968, 1018 [ (¶ 138) ] (Miss. 2007). However, where [an appellate court] does not find any error in the case, there can be no cumulative error that warrants reversal.
 
 Harris v. State,
 
 970 So.2d 151, 157 [ (¶ 24) ] (Miss.2007).
 

 Osborne v. State,
 
 54 So.3d 841, 848 (¶ 27) (Miss.2011).
 

 ¶ 37. As there was no error in this case, there can be no cumulative error, and this contention of error is without merit.
 

 ¶ 38. THE JUDGMENT OF THE PIKE COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, ARMED ROBBERY, AND COUNT II, AGGRAVATED ASSAULT, AND SENTENCE OF LIFE FOR COUNT I AND TWENTY YEARS FOR COUNT II, WITH THE SENTENCES TO RUN CONCURRENTLY, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PIKE COUNTY.
 

 LEE, C.J., GRIFFIS, P.J., MYERS, BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND RUSSELL, JJ., CONCUR.