# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-KA-00903-SCT

*ELMER NORWOOD*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/29/2021 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | MARK G. WILLIAMSON |
| | JAY HOWARD HURDLE |
| | PAYTREEN KEYUM DAVIDSON |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | ZAKIA B. CHAMBERLAIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALEXANDRA ROSENBLATT |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/11/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., COLEMAN AND BEAM, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.    Elmer Norwood appeals his conviction in the Oktibbeha County Circuit Court for aggravated domestic violence, claiming that his trial counsel was constitutionally ineffective for failing to introduce evidence that would have impacted his accuser's credibility. Finding no merit to Norwood's ineffective-assistance-of-counsel claim, we affirm Norwood's conviction.

## FACTS AND PROCEDURAL HISTORY

¶2. On June 15, 2019, Amy's[1] son Bradley dropped Amy off at her apartment complex sometime between 10:00 a.m. and 11:00 a.m. Amy walked up to her apartment and saw Norwood, with whom she was in a relationship at the time, standing outside her door. Amy went inside the apartment and would not let Norwood in. Amy testified that Norwood removed an air conditioning unit from her window and climbed inside the apartment.

¶3. Amy asked Norwood why he was inside her apartment after she told him he could not come inside. Sometime thereafter, Amy went into her bedroom. Norwood walked into Amy's bedroom and asked her what she was doing. Amy said she was getting clothes ready to go stay at her son's place for Father's Day. Norwood said okay and turned to walk away. Norwood then turned back toward Amy, grabbed her by the throat, and threw her inside the bedroom closet. Norwood began punching Amy and threw her on the bed.

¶4. Amy tried to defend herself, but Norwood threw her on the floor and began kicking her in the face. Amy testified that Norwood kicked her at least five to ten times, and she thought he was going to kill her.

¶5. Afterwards Norwood picked Amy up and told her to go wash her face. Amy went to the bathroom and cleaned her face. Amy said it felt like her jaw was broken, and she said that her face was turning purple. Amy then went into her living room and sat down. Norwood took her phone from her and would not give it back.

¶6. Amy asked Norwood if she could go to the store and get something to eat. Norwood agreed to let her go but insisted on going with her to make sure she did not call the police.

---

[1] The victim's last name is omitted.

¶7. Around 4:30 p.m., the two walked to a nearby convenience store located on West Side Drive. Amy ordered a hamburger and they both got something to drink. Amy said she wanted to tell people in the store what had happened, but Norwood stood beside her the entire time.

¶8. The two left the store and walked back to Amy's apartment. Once inside, Amy lay down on the couch and fell asleep. When she awoke, Norwood was standing outside the apartment. She said that Norwood had placed her phone beside her.

¶9. Amy tried calling her son but could not reach him. She then called her ex-husband, who was able to contact Amy's son. Amy's mother, brother, and son arrived at the apartment soon after. Norwood was still there. Amy told them that Norwood had broken her jaw, and Amy's mother "yelled and cussed" Norwood.

¶10. Amy's family took her to the hospital in Starkville, Mississippi. A CT scan showed at least ten fractures to Amy's face. Due to the severity of Amy's broken jaw, the hospital transported Amy to the University of Mississippi Medical Center in Jackson for surgery. Amy's jaw has yet to heal properly, and she is still unable to wear her lower dentures.

¶11. Norwood was indicted for aggravated domestic violence. Prior to trial, the State moved *in limine* to exclude evidence of Amy's "drug use or drug related activities."

¶12. Norwood opposed the motion, noting that Amy had tested positive for methamphetamine at the hospital. He argued that Amy's purported drug use was relevant to the defense's theory that Amy "could have been confused, could have been disoriented, [or] could have simply been acting out."

3

¶13.   The trial court agreed with Norwood, finding that "it's a fair inquiry to ask if Amy had been using methamphetamine or amphetamine the day" of the event since it could "affect her recollection of what happened." The trial court denied the State's motion in part, ruling that it would not allow any references to Amy's being a "crack head."

¶14.   At trial, Amy's son testified that when he arrived at his mother's apartment, Norwood answered the door. There was blood all over Amy's bed. Amy's face was so swollen that she "was almost unrecognizable."

¶15.   Amy's mother testified that when she arrived at Amy's apartment, Norwood was there. When Amy said Norwood was the one who had beaten her, Norwood stood "in the doorway with a smirk on his face."

¶16.   At the time of the attack, Norwood was wearing a GPS monitoring device on his ankle. The State submitted a GPS report at trial that showed Norwood's location throughout the day on June 15. The report placed Norwood at Amy's apartment at the time Amy said her son had dropped her off around mid-morning June 15. Norwood remained at that location until approximately 4:27 p.m., when he left and traveled along West Side Drive. Norwood arrived back at Amy's apartment at approximately 4:51 p.m.

¶17.   The GPS report matched Amy's testimony that Norwood was at her apartment when she said he was there, except for the brief period when the pair traveled to the convenience store on West Side Drive.

¶18.   The State presented recorded phone conversations between Norwood and Amy that occurred when Norwood was in jail after his arrest for the assault. Norwood told Amy, "just

4

don't show up" at trial, "[n]o witness, no case." Norwood told Amy he was "sorry for what happened." Amy also testified that an unknown man came to her apartment prior to trial and told her not to come to court because they were trying to give Norwood "twenty years."

¶19. The jury found Norwood guilty of aggravated domestic assault, and this appeal followed. The only issue presented is Norwood's claim that his trial counsel was constitutionally ineffective for not cross-examining Amy about her purported drug use.

**DISCUSSION**

¶20. To succeed on an ineffective-assistance-of-counsel claim, Norwood must meet the two prongs set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), as adopted by this Court in *Stringer v. State*, 454 So. 2d 468, 476-78 (Miss. 1984). First, Norwood "must show that counsel's performance was deficient." *Stringer*, 454 So. 2d at 477 (quoting *Strickland*, 466 U.S. at 687). Second, Norwood must also show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Cabello v. State*, 524 So. 2d 313, 315 (Miss. 1988) (internal quotation mark omitted) (quoting *Strickland*, 466 U.S. at 694).

¶21. This Court has explained that, "generally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Dartez v. State*, 177 So. 3d 420, 422-23 (Miss. 2015) (citing *Archer v. State*, 986 So. 2d 951, 955 (Miss. 2008)). An appellate court is limited on direct appeal to the trial-court record before it, "and there may be instances in which insufficient evidence and/or information exists within the record to address the claim adequately." *Id.* at 423 (citing *Archer*, 986 So. 2d at 955). "This Court

5

may, however, address an ineffectiveness claim on direct appeal if the presented issues are based on facts fully apparent from the record." *Eubanks v. State*, 341 So. 3d 896, 908 (Miss. 2022) (internal quotation marks omitted) (quoting *Parker v. State*, 30 So. 3d 1222, 1232 (Miss. 2010)).

¶22.    Here, the record illustrates that defense counsel conducted a thorough investigation into the matter in preparation for Norwood's defense. Counsel discovered evidence of Amy's drug use and successfully argued its relevance in the case in challenging the State's motion *in limine* to exclude it. Defense counsel, however, did not bring it up during his cross-examination of Amy.

¶23.    We find that this constituted trial strategy on the part of defense counsel. "'[C]ounsel's choice of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections fall within the ambit of trial strategy' and cannot give rise to an ineffective assistance of counsel claim." *Id.* at 909 (internal quotation mark omitted) (quoting *Powell v. State*, 806 So. 2d 1069, 1077 (Miss. 2001).

¶24.    Defense counsel thoroughly and extensively cross-examined Amy, bringing out a number of inconsistencies between her statement to the police and her trial testimony. Counsel repeatedly attempted to cast doubt on Amy's credibility as to why she did not try to get away from Norwood or call for help sooner. As the State points out, if the jury knew Amy was on drugs, this could have explained her reactions.

¶25. Further, according to the motion *in limine* hearing, although Amy's medical records indicated methamphetamine use sometime around the alleged assault, when or if Amy would have been experiencing the effects of the drug(s) on the day or time in question was unclear.

¶26. Based on our review of the record, we find highly unlikely that defense counsel simply forgot to ask Amy about her purported drug use. Rather, the record fairly shows that defense counsel purposefully chose, for whatever reason, not to inquire about Amy's purported drug use. We reiterate that "[this] Court strongly presumes that counsel's conduct falls within the wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy." ***Ross v. State***, 288 So. 3d 317, 324 (Miss. 2020) (internal quotation marks omitted) (quoting ***Swinney v. State***, 241 So. 3d 599, 613 (Miss. 2018)).

¶27. But even if we were to assume that defense counsel forget to ask Amy about her purported drug use, we still find that Norwood has failed to demonstrate "that, but for counsel's unprofessional errors, the result of the proceedings would have been different." ***Id.*** (internal quotation mark omitted) (quoting ***Chamberlin v. State***, 55 So. 3d 1046, 1050 (Miss. 2010)).

¶28. Norwood argues on appeal that during voir dire when the State asked the prospective jurors, "Would anyone here give less credibility to the testimony of a victim who used drugs the day before she was assaulted[,]" one juror (Juror 48) responded, "Yes." Norwood contends that because Juror 48 was ultimately selected as the twelfth member of Norwood's jury, a reasonable probability was demonstrated that the result of Norwood's trial would have

7

been different but for defense counsel's failure to elicit testimony that Amy was likely high on methamphetamine at the time of her attack. We disagree.

¶29. The following colloquy took place after Juror 48 responded affirmatively to the above question:

> State: So, the fact that the victim used drugs the day before an assault, would you have difficulty believing their testimony that they were assaulted by their partner?
>
> Juror 48: I wouldn't have difficulty believing they were assaulted. But that would be part of my decision process.
>
> State: Okay. So you would give that some consideration?
>
> Juror 48: Yes.
>
> . . . .
>
> State: Knowing that, though, could you still be able to base your decision as to the guilt or innocence of the individual based on the evidence and the law that's presented?
>
> Juror 48: Yes.

¶30. The jury is charged with judging the credibility of the witnesses. *Jackson v. State*, 614 So. 2d 968, 972 (Miss. 1993). The jury also has the duty to consider all of the evidence presented. *Smith v. State*, 245 So. 2d 583, 587 (Miss. 1971). The colloquy illustrates that Juror 48 understood this responsibility.

¶31. The colloquy also illustrates that even though no mention was made at trial regarding Amy's purported drug use, the jury nonetheless was aware of it. And given so, defense counsel may have decided there was no reason for delving into it during Amy's cross-examination.

8

¶32. But apart from this, the State presented strong corroborating evidence aside from Amy's testimony. As mentioned, the State submitted a GPS report with tracking data from Norwood's electronic monitoring device. This evidence put Norwood and Amy together for most of day on June 15, including before and after the alleged assault.

¶33. When Amy's family arrived at her apartment, Norwood was there. Amy's son testified that there was blood all over Amy's bed and that her face was so swollen that she "was almost unrecognizable." Amy's mother testified that when Amy told them Norwood had attacked her, Norwood just stood there smirking.

¶34. Given all of the evidence presented, even if we were to accept that defense counsel should have inquired about Amy's purported drug use during Amy's cross-examination, we find that there is not a reasonable probability that, but for counsel's failure, the result of Norwood's trial would have been different. *Cabello*, 524 So. 2d at 315. Accordingly, we find that Norwood's ineffective-assistance-of-counsel claim is without merit.

## CONCLUSION

¶35. Norwood's conviction for aggravated domestic violence is affirmed.

¶36. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**