CARLSON, Presiding Justice,
for the Court:
¶ 1. William Matthew Wilson was indicted, in a multiple-count indictment, for capital murder with the underlying felony of child abuse and for a separate count of felonious child abuse. Wilson pleaded guilty to capital murder and to the separate child-abuse count.[1] He purportedly waived a sentencing hearing before a jury. He was sentenced to death for capital murder and to twenty years for felonious child abuse. We affirmed Wilson’s death sen *1070 tence. Wilson v. State, 21 So.3d 572 (Miss.2009), cert. denied, Wilson v. Mississippi, - U.S. -, 130 S.Ct. 3282, 176 L.Ed.2d 1191 (2010). The mandate issued from this Court on December 10, 2009. Wilson timely filed his motion seeking post-conviction collateral relief. The Attorney General has filed a response, and Wilson has filed a reply to that response. Upon review of the claims raised, we find that Wilson has established that he is entitled to an evidentiary hearing on certain grounds; therefore, his PCR motion is granted in part and denied in part.
FACTS AND PROCEDURAL HISTORY
¶ 2. The following statement of facts is taken from this Court’s opinion in Wilson v. State:
On April 29, 2005, two-year-old Malorie Conlee was airlifted from her home and transported to North Mississippi Medical Center in Tupelo, where she subsequently was pronounced dead due to a closed head injury. Malorie had been living in a mobile home in the Mooreville area with her mother, Augustina Conlee [FN1] and her mother’s boyfriend, William Matthew Wilson. At the hospital, Wilson first told law enforcement officials that Malorie had sustained the head injury when his motorcycle fell on her. The examining physician at North Mississippi Medical Center determined that the injuries were more consistent with child abuse.
FN1. Augustina Conlee also is referred to in the record as Augustina Conner.
Wilson subsequently gave the following account of Malorie’s symptoms and behavior to law enforcement officials. Wilson stated that on the previous day, Malorie had been making irregular, convulsive movements and had exhibited a soft spot on her head that he described as “mushy.” He also stated that only one of Malorie’s eyes would dilate when exposed to a flashlight. Wilson admitted that he and Augustina had failed to seek medical attention for Malorie due to his fear that bruising he had inflicted on Malorie’s cheeks would be discovered.[2] He further stated that Malorie had been vomiting that evening. When asked about the burns on Malorie’s feet,[3] Wilson stated that these burns had been sustained previously when Malorie had been left unattended in the bathtub. Wilson gave essentially this same account to law enforcement officials when interviewed again at the Lee County Sheriffs Office. Later, in yet another interview, after being confronted with the fact that a search of the premises revealed that the motorcycle appeared to be basically untouched and covered in cobwebs, Wilson told law enforcement officials that Malorie’s head injury had been sustained after he had dropped her on the kitchen floor. Prior to giving each of these statements, Wilson was given Miranda warnings. [FN2]
FN2. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
In an interview with law enforcement officials, Conlee admitted that Wilson *1071 had told her he had hit Malorie in the head and had choked her. In a subsequent interview, Wilson confessed that he had hit Malorie in the head with his fist three times. According to Wilson, Malorie was then put to bed on a pallet on the floor, where Wilson reported she had made irregular movements with her arms, and that she had cried and moaned. Wilson further stated that he had gone to sleep[4] and, upon waking in the early morning hours of April 29, 2005, he had discovered that Malorie was unresponsive and blue in color, and that he had finally called 911.
On July 19, 2005, Wilson was indicted by the Lee County Grand Jury for capital murder while engaged in the commission of felonious abuse of a child committed on or about April 29, 2005 (Count I)[FN3], and felonious child abuse of a child committed on or about January 19, 2005 (Count II).[FN4] Prior to the trial date, Wilson entered into a plea agreement with the prosecution whereby the State, in exchange for guilty pleas from Wilson on both counts in the indictment, would recommend a life sentence without parole as to Count I, in lieu of the death penalty, and a sentence of twenty years as to Count II, with the second sentence to run consecutively with the first sentence.
FN3. Miss.Code Ann. § 97 — 3—19(2)(f) [Rev.2006],
FN4. Miss.Code Ann. § 97-5-39(2)(a) [Rev.2006].
On March 5, 2007, the Circuit Court of Lee County, Judge Thomas J. Gardner, III presiding, conducted a plea hearing. During the plea colloquy, Wilson expressed dissatisfaction with his appointed counsel. As a result, the trial judge refused to accept his pleas of guilty, and Wilson was returned to the custody of the Lee County Sheriff.[5]
On May 24, 2007, Judge Gardner reconvened court to consider Wilson’s renewed interest in entering guilty pleas on both counts in the indictment. The prosecution informed the trial court and Wilson (and Wilson’s counsel) that the State had withdrawn its previous sentencing recommendation of life without parole plus twenty years, and that the State would once again seek the death penalty on the capital murder charge. During this second guilty plea colloquy, Wilson informed the trial court that he was satisfied with the performance of his appointed counsel. After the trial court conducted an extensive examination of Wilson regarding the voluntariness of his guilty pleas, the pleas were accepted on both counts of the indictment, and a sentencing hearing was scheduled for May 29, 2007. The sentencing phase was conducted without a jury as Wilson previously had waived his right to a jury, both orally and in writing. The prosecution and the defense presented witnesses and arguments to the court during the sentencing proceedings. At the conclusion of the sentencing hearing, *1072 Judge Gardner entered a sentencing order on May 30, 2007.
The trial judge found beyond a reasonable doubt that, pursuant to Mississippi Code Section 99-19-101(7), Wilson killed Malorie Conlee, based on the fact that Wilson confessed to having done so and based upon the testimony of the pathologist, Dr. Hayne. Moreover, the trial judge found beyond a reasonable doubt that the following aggravating circumstances existed: (1) the killing of Malo-rie Conlee was committed while in the commission of felonious child abuse; (2) the capital offense was especially heinous, atrocious, and cruel due to the child’s age, small stature, inability to defend herself, nature of the injuries inflicted by Wilson, and the amount of time in which Malorie suffered due to the failure of Wilson and Malorie’s mother to seek medical treatment for her. See Miss.Code Ann. §§ 99-19-101(5)(d), 99-19-101(5)(h) (Rev.2007). The trial judge found the following mitigating factors: (1) the defendant had no significant criminal history, and (2) the defendant was twenty-four years old at the time of the occurrence. See Miss. Code Ann. §§ 99-19-101(6)(a), 99-19-101(6)(g) (Rev.2007). The trial court found that the aggravating circumstances outweighed the mitigating circumstances; thus, the trial court imposed a sentence of death for the capital murder conviction. On June 7, 2007, Wilson filed a post-trial “Motion for Judgment of Acquittal JNOV as to Sentence or in the Alternative for a New Penalty Phase Trial.” The trial court denied Wilson’s motion on June 18, 2007.
Wilson, 21 So.3d at 574-76.
¶ 3. The record and exhibits to the motion further reveal that during Wilson’s arraignment on September 7, 2005, Wilson stated that he believed that his family had hired Robert Sneed Laher to represent him, but Laher did not appear at the hearing. The prosecutor stated that he spoke with Laher earlier that morning and Laher informed him that he had been hired to handle certain preliminary matters only. Wilson stated “I thought he was supposed to have been my attorney.... To my understanding from my family, he was going to be my attorney. They have been meeting with him every week.” At that point, the court appointed William C. (Will) Bris-tow to be Wilson’s attorney. At the conclusion of the arraignment, the court allowed Bristow to interview Wilson. This interview lasted approximately half an hour.
¶ 4. On December 2, 2005, Bristow filed a motion seeking the appointment of additional counsel. By order entered on December 19, 2005, Laher was appointed as additional counsel to represent Wilson. Although Bristow was lead counsel, the few pleadings filed in the record over the next seven months were filed by Laher. During a hearing to consider several motions on July 13, 2006, Laher was removed as counsel on the court’s own motion. The Court stated that Laher would not be paid by the county. From the transcript, it is clear that the court was dissatisfied with Laher. Bristow attended the hearing and acted as if he were substituting for Laher instead of serving as Wilson’s lead counsel. The Court stated that it would appoint additional counsel to assist Bristow. At the conclusion of the hearing, the court and counsel discussed the fact that all of the motions were not resolved and that the case was set for trial on August 21, 2006, which was a little more than a month away. The court stated that it would not continue the case and Bristow assured the court that he would be ready to try the case.
*1073 ¶ 5. On July 27, 2006, Bristow filed another motion for the appointment of additional counsel and a motion for a continuance. The court continued the trial to the next term and by order entered on August 29, 2006, James P. Johnstone was appointed as additional counsel. Bristow and Johnstone represented Wilson during the remainder of the case before the circuit court. Andre’ de Gruy, of the Office of Capital Defense Counsel (OCDC), represented Wilson on appeal.[6] Bristow, John-stone, and de Gruy have signed affidavits which support Wilson’s claims for post-conviction collateral relief.
¶ 6. On appeal, this Court considered the following issues: (1) whether the trial court abused its discretion and arbitrarily refused to accept Wilson’s first guilty plea on March 5, 2007, thus preventing Wilson from accepting the plea-bargain agreement for life imprisonment, or in the alternative, whether Wilson was denied effective assistance of counsel that resulted in his loss of enforcement of the original plea-bargain agreement, all in violation of our state and federal constitutions; (2) whether the prosecution committed misconduct by improperly cross-examining a mitigation witness, thus depriving Wilson of a fundamentally fair sentencing hearing; (3) whether the admission of testimony by Dr. Steven T. Hayne was improper and a result of ineffective assistance of counsel; (4) whether the victim impact testimony was improper and in violation of Wilson’s constitutional rights; and (5) whether cumulative error required reversal of Wilson’s conviction and sentence of death. Wilson, 21 So.3d at 576.
¶ 7. We found all but one of Wilson’s issues to be without merit. Id. at 592-93. Regarding Wilson’s claim that he was denied constitutionally effective assistance of counsel during Wilson’s guilty-plea proceedings, we found “that the factual basis of this claim has not been fully developed.” Id. at 580. We concluded that this issue should be presented in subsequent post-conviction proceedings. Id. We affirmed the circuit court’s “judgment that ... Wilson suffer the penalty of death for the capital murder of Malorie Conlee.” Id. at 592-93. The dissent opined “that Wilson was denied counsel during a critical stage of the proceedings....” Id. at 593 (Kitchens, J., dissenting). The dissent argued that such denial warranted a new trial. Id. at 594 (Kitchens, J., dissenting). The mandate issued on December 10, 2009.
¶ 8. Wilson, represented by the Mississippi Office of Capital Post-Conviction Counsel, timely filed his Motion for Leave to Proceed in the Trial Court with a Petition for Posi>-Conviction Relief. In the motion, Wilson asserts the following grounds for relief: (1) Wilson’s trial counsel were woefully ineffective in failing to communicate or form a relationship with Wilson, and they also failed to investigate guilt or mitigation evidence to present on Wilson’s behalf; (2) after Wilson repeatedly voiced his dissatisfaction with counsel’s *1074 performance, the trial court had a duty to investigate appointed counsel’s ineffectiveness, and because the trial court failed to inquire into Wilson’s complaints and further failed to appoint substitute counsel, Wilson’s Sixth, Eighth, and Fourteenth Amendment rights were violated; (3) after the trial court halted the March 5 plea hearing, the State immediately withdrew the plea offer, thus violating Wilson’s constitutional rights by this act of prosecutorial vindictiveness; (4) Wilson did not knowingly, intelligently, and voluntarily waive his right to a jury, and because his waiver was invalid, Wilson’s death sentence must be vacated; (5) the egregious ineffective assistance of counsel resulted in a failure to prevent or preserve objection to the prosecutorial vindictiveness, improper waiver of a jury, and failure to present available mitigation evidence; and (6) although these issues alone warrant relief, the cumulative errors present in Wilson’s case have denied him his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.
DISCUSSION
¶ 9. We consistently have stated the standard of review as follows:
This Court has recognized that post-conviction-relief actions have become part of the death-penalty appeal process. Jackson v. State, 732 So.2d 187, 190 (Miss.1999). The standard of review for capital convictions and sentences is “one of ‘heightened scrutiny’ under which all bona fide doubts are resolved in favor of the accused.” Flowers v. State, 773 So.2d 309, 317 (Miss.2000) (citations omitted). “This Court recognizes that ‘what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.’ ” Id.
Chamberlin v. State, 55 So.3d 1046, 1049-1050 (Miss.2010). We discuss the issues today as presented by Wilson’s current counsel.
I. WHETHER WILSON’S TRIAL COUNSEL WERE INEFFECTIVE BY FAILING TO COMMUNICATE OR FORM A RELATIONSHIP WITH WILSON, AND BY FAILING TO INVESTIGATE GUILT OR MITIGATION EVIDENCE TO PRESENT ON WILSON’S BEHALF.
¶ 10. Wilson contends that his trial counsel did not properly communicate with him, did not properly investigate the case, and did not prepare for the penalty phase.[7] As a result of counsel’s errors, Wilson asserts that he lost the benefit of the plea agreement that he had reached with the State. In Wilson, we stated the standard for assessing a claim of ineffective assistance of counsel:
The United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), established the standard for assessing whether counsel was ineffective. For a claim of ineffective assistance of counsel, a defendant must establish: (1) counsel’s performance fell below an objective standard of reasonableness, and (2) the defense was prejudiced as a result. Strickland, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In the case of a guilty plea, the second prong of prejudice is shown by proving that the ineffective assistance of counsel affected the outcome of the plea process. Hill v. Lockhart, 474 U.S. 52, 58, 106 S.Ct. 366, *1075 370, 88 L.Ed.2d 203 (1985). “Judicial scrutiny of counsel’s performance must be highly deferential.” Strickland, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.
Wilson, 21 So.3d at 578. We have held:
While courts must defer to lawyers’ judgments and strategies, “at a minimum, counsel has a duty to interview potential witnesses and to make independent investigation of the facts and circumstances of the case.” Ferguson v. State, 507 So.2d 94, 96 (Miss.1987). Under this standard, counsel may be deemed ineffective for relying almost exclusively on material furnished by the State during discovery and conducting no independent investigation. Id. While counsel is not required to exhaust every conceivable avenue of investigation, he or she must at least conduct sufficient investigation to make an informed evaluation about potential defenses. State v. Tokman, 564 So.2d [1339,] 1343 [ (Miss.1990) ]. Under Strickland, counsel has a duty “to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.” Strickland, 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d 674.
Ross v. State, 954 So.2d 968, 1005 (Miss.2007). The United States Supreme Court has stated:
“The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.” Id., 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674. We long have recognized that “[prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable....”[8] Ibid.; Bobby v. Van Hook, 558 U.S. -, -, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009) (per curiam); Florida v. Nixon, 543 U.S. 175, 191, and n. 6, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004); Wiggins v. Smith, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Although they are “only guides,” Strickland, 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674, and not “inexorable commands,” Bobby, 558 U.S. at -, 130 S.Ct. at 17, these standards may be valuable measures of the prevailing professional norms of effective representation ....
Padilla v. Kentucky, — U.S. -, 130 S.Ct. 1473, 1482, 176 L.Ed.2d 284 (2010) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052). “From counsel’s function as assistant to the defendant derive the overarching duty to advocate the defendant’s cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.” Strickland, 466 U.S. at 688, 104 S.Ct. 2052 (emphasis added); see also Florida v. Nixon, 543 U.S. 175, 187, 125 S.Ct. 551, 560, 160 L.Ed.2d 565 (2004) (“An attorney undoubtedly has a duty to consult with the client regarding ‘important decisions,’ including questions of overarching defense strategy.”). A defendant facing the death penalty has the right to provide the jury with mitigating evidence. Williams, 529 U.S. at 393, 120 S.Ct. 1495 (“In the instant case, it is undisputed that Williams had a right — indeed, a constitutionally protected right — to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer.”) Counsel must conduct an adequate investigation in order to be able to present that mitigating evidence to the jury.
*1076 A. FAILURE TO COMMUNICATE
¶ 11. Wilson argues that his trial counsel was constitutionally ineffective because his attorneys failed to communicate adequately with him prior to the plea hearing on March 5, 2007. This argument was raised on direct appeal, and we found that “the factual basis of this claim has not been fully developed.” Wilson, 21 So.3d at 580. We found that this issue would be better suited for post-conviction-relief proceedings. Id. The dissent opined that sufficient facts were apparent in the appellate record to show that Wilson was denied counsel during a critical stage of the proceedings and that his Sixth Amendment rights had been violated. Id. at 593-94 (Kitchens, J., dissenting).
¶ 12. In discussing this issue, we noted that Wilson expressed dissatisfaction with his counsel during the plea colloquy on March 5, 2007. Id. at 577-78. We noted that Wilson sent two unsworn letters to the trial judge “wherein he expressed his dissatisfaction with his lawyers.” Id. at 578. We also noted that the appellate record included unsworn itemizations of services filed by both of Wilson’s trial counsel in support of their motions for compensation. Id. at 580. We stated:
Simply stated, two unsworn letters and an unsworn itemization of services attached to a motion for compensation hardly rise to the level of being “facts fully apparent from the record” to the extent that we may appropriately address this issue on direct appeal. We do not have competing affidavits[9] from court-appointed trial counsel or other individuals who might shed any light on this issue. Likewise, it is not readily apparent from a review of the record whether Judge Gardner ever saw these letters from Wilson.
Id.
¶ 13. Wilson has included several exhibits with his post-conviction-relief motion which support his claim that counsel did not adequately communicate with him. During a hearing conducted on November 4, 2010, the trial judge considered Wilson’s post-conviction motion for discovery which included a request to depose the trial judge regarding whether he ever saw Wilson’s letters. The trial judge denied the motion, but stated for the record that he saw the letters and that it was the judge who had forwarded the letters to the clerk’s office for filing in the court file.
¶ 14. Wilson also includes his affidavit wherein he states, in pertinent part:
3. The only times I saw Mr. Johnstone were in court at the plea hearings. Mr. Johnstone told me that his mother was in the hospital in Birmingham, Alabama and he was busy visiting her.
4. Mr. Bristow never had time to discuss my case with me. When I did see Mr. Bristow in court, he was always too busy to talk to me. When I tried to talk to him at docket call, Mr. Bristow would tell me that he did not have my case file with him so he could not discuss the case. Mr. Bristow never discussed the motions he was filing in my case with me. Mr. Bristow never discussed possible defense such as manslaughter with me.
5. Mr. Bristow never talked to me about possible defenses at the penalty phase. He never asked me for names of friends and family who *1077 would be willing to make a case for my life.
Wilson also states that he wrote many letters to Bristow “in an attempt to get him to come visit me.” Wilson states that, by letter dated August 9, 2006, Bristow stated that he was hiring a private investigator who would “perform an investigation under [Bristow’s] direction.”[10] However, no investigator was ever hired. Wilson also received a letter from Bristow dated November 27, 2006, wherein Bristow stated that he “formally requested that the Office of Capital Defense Counsel assist in [Wilson’s] defense and it appears that we will be enjoying its assistance in your defense.” [11] However, Bristow never took the steps necessary to get the OCDC appointed to the case. Wilson’s affidavit further states:
9.Before I went to court in March, I wrote[12] Judge Gardner, as the Mississippi Bar instructed me to, and told him that my lawyers had not been meeting with me about my ease. I told Judge Gardner that I had never met Mr. Johnstone and that I had only seen Mr. Bristow at arraignment, two hearings, and one time in the jail. This letter is attached to the affidavit as [attachment] E. The judge never wrote me back.
10. My lawyers did not explain the state’s evidence or my possible defenses with me. When I was at the first plea hearing, I did not know if I was making a good decision because I did not know what my options really were.
11. During my plea hearing on March 5, 2007 I told Judge Gardner that I was unhappy with my attorneys because what little time they had spent with me was spent convincing me to plead guilty. My attorneys had spent very little time, if any, going over the evidence of the case with me. They had not discussed my possible defenses to the charges, nor did they discuss the sentencing part of the trial with me. I was unaware of what kind of evidence could be offered at sentencing on my behalf. I told Judge Gardner that I did not think I could receive a fair trial because I felt like my attorneys had not properly investigated the case and thoroughly discussed the case and my options with me. I was not sug *1078 gesting that Judge Gardner would not give me a fair trial.
12. Before the plea hearing on March 5, 2007, my mother called[13] my former lawyer Rob Laher for advice because she could not get in contact with Mr. Bristow. My mother told Rob Laher that I was pleading guilty only because my appointed lawyers had not discussed my case and I felt it was my only option. Mr. Laher told my mother I needed to have that in the court record so the Judge would know. I spoke up at the hearing because of my concerns about my lawyers, not because I was against pleading to avoid a death sentence. I just did not know what my real options were. I have never discussed my case with my lawyers or an investigator. I did not know the overall strength of the evidence and whether I had any defenses. I did not know that Judge Gardner would not accept my guilty plea and the State would withdraw the sentence recommendation of life without the possibility of parole just because I was unhappy with my lawyers.
13. After Judge Gardner refused to accept my plea, I wrote[14] him again to let him know my lawyers were still not coming to see me. In this letter I told Judge Gardner that I felt my lawyers were not acting in my best interest and I asked that they be dismissed. I told Judge Gardner that my lawyers were not meeting with me to discuss my case. A copy of this letter is attached as [attachment] F. Judge Gardner did not answer this letter either.
¶ 15. Both Bristow and Johnstone have signed affidavits in support of Wilson’s post-conviction motion. Those affidavits are set forth in their entirety:
I,William C. Bristow, affiant, being over the age of twenty-one (21) and an adult resident citizen of Lee County in the State of Mississippi, and after being duly sworn, states [sic] on oath the following:
1. I am an attorney who is licensed to practice law in the State of Mississippi and who has been licensed since 1991.
2. I met Mr. William Matthew Wilson at his arraignment. During our first meeting, Mr. Wilson told me that Rob Laher was his lawyer. I called Mr. Laher and he informed me that he was hired to represent Mr. Wilson at his preliminary hearing and he was no longer Mr. Wilson’s lawyer. Judge Gardner appointed me to Mr. Wilson’s case. I requested Mr. Laher be appointed as my co-counsel because Mr. Wilson had some history with Rob Laher and wanted Rob Laher to be his lawyer. Judge Gardner appointed Rob Laher.
3. Mr. Laher and I discussed the case and filed motions. I was planning on arguing the motions I filed[15] and *1079 Mr. Laher was planning on arguing the motions he filed. Rob Laher did not show up in court the day of the motion hearing. I called Rob Laher’s office and his secretary informed me that he was home sick. I reported to the Judge that Mr. Laher was ill. The Judge asked me to find Mr. Laher. I called Mr. Laher at home and he told me he had a family emergency. The Judge ordered Mr. Laher to appear in court. When Rob Laher arrived in court, Judge Gardner removed him from the case. I had to argue all the motions.
4. I applied for another co-counsel and Jim Johnstone was appointed.
5. Mr. Johnstone and I agreed that I would be responsible for the guilt phase and Mr. Johnstone would be responsible for the sentencing phase of Mr. Wilson’s trial.
6. During the time we were preparing for the case, Mr. Johnstone’s mother was dying in a hospital in Birmingham. It was an awful time. Mr. Johnstone was driving back and forth to Birmingham. I was communicating with him by telephone. I don’t believe that Mr. Johnstone met with Mr. Wilson until a couple of months before the plea.[16] We discussed pursuing a continuance due to the situation with Mr. John-stone’s mother but we never did.
7. Mr. Wilson was evaluated by Criss Lott, PhD. I sent discovery and some other materials to Dr. Lott. Since Mr. Johnstone was in charge of mitigation, I assumed Mr. John-stone was going to follow up with Dr. Lott.[17]
8. I listened to Mr. Wilson’s confession and found it to be very damaging. My strategy was to get the confession suppressed. After the Judge denied my suppression motion,[18] I began working on the prosecutor to *1080 offer us a deal of life without the possibility of parole.
9. When the prosecutor finally offered us life without the possibility of parole, I spent the day talking to Mr. Wilson. I advised him to take the deal and by the end of the day he agreed.
10. We thought Mr. Wilson was going to plead guilty in March 2007. However, Mr. Wilson expressed dissatisfaction with us, and the judge stopped the hearing.
11. I thought the prosecutor was wrong to withdraw the deal for a sentence of life without parole. Nothing changed except that Mr. Wilson had a complaint about Mr. Johnstone and me.
12. Mr. Wilson’s plea hearing was continued until or about May 24, 2007. Both Mr. Johnstone and I were operating on the assumption that if the plea went well, Judge Gardner would honor the original recommendation of the original plea agreement, even though I was fully advised that the State withdrew the offer. I advised Mr. Wilson that his best chance of a life sentence was to plea in front of Judge Gardner.
13. I am not sure what Mr. Johnstone did to prepare for the penalty phase of the trial. Last January,[19] I attended a capital defense seminar and learned that the ABA guidelines say that a defense attorney should spend 400 hours on mitigation. I doubt this much time was spent on mitigation.
14. I never counseled Mr. Wilson that Judge Gardner had previously imposed a death sentence on waiver of a jury for sentencing in a capital case. I was not aware of Judge Gardner’s sentencing record.
(Emphasis added.)
I,James P. Johnstone, affiant, being over the age of eighteen (18) and competent to testify to the truth of the matters set forth herein, state on oath the following:
1. I am an attorney who is licensed to practice law in the State of Mississippi and who has been so licensed since May 1,1980.
2. On or about August 29, 2006, I was appointed to assist William Bristow in representing William Matthew Wilson in his capital murder trial in Lee County Circuit Court Cause No. CR 05-635.
3. I was not appointed to represent Mr. Wilson at the beginning of his case, but rather, I was appointed after Attorney Rob Laher was dismissed from the case by Judge Gardner.
4. The Itemized Statement for Compensation and Expenses that I submitted to the Lee County Circuit Court is a true and correct representation of my time spent in my representation of William Wilson.
5. I understand that Mr. Wilson was evaluated by Criss Lott, PhD. I don’t recall talking to Dr. Lott or sending him any information about Mr. Wilson. As I recall, Mr. Bris-tow was going to contact Dr. Lott.[20]
6. Mr. Bristow and I agreed that I would be responsible for calling the witnesses during the sentencing phase of Mr. Wilson’s trial.
*1081 7. With the facts as they were in Mr. Wilson’s case, I did not believe in my opinion that the case would result in a death sentence. In my opinion, it was not a case in which the death penalty would be given.
8. My co-counsel, Will Bristow and I, thought Mr. Wilson was going to plead guilty on March 5, 2007. However, Mr. Wilson expressed dissatisfaction with us, and the judge stopped the hearing. I was surprised when Mr. Wilson complained to the judge about our representation of him.
9. I thought the prosecutor was wrong to withdraw the deal for a sentence of life without parole in exchange for a plea of guilty. Nothing changed except that Mr. Wilson complained about my and Mr. Bristow’s representation of him.
10. Mr. Wilson’s plea hearing was continued until on or about May 24, 2007. Both Mr. Bristow and I were operating on the assumption that if the plea went well, Judge Gardner would honor the original recommendation of the original plea agreement, even though I was fully advised that the State had withdrawn the offer.
11. During the sentencing, we produced and put on three witnesses. We thought their testimony, as well as other factors in the case, would convince the Judge to not impose death.

12.I do not recall counseling Mr. Wilson that Judge Gardner had previously imposed a death sentence on waiver of a jury for sentencing in a capital case.

[21]

(Emphasis added.) Bristow’s and John-stone’s itemizations of services in support of their motions for compensation are found in the appellate record and are exhibits to Wilson’s post-conviction motion. Bristow’s itemization reveals only one “conference with client” before the failed plea hearing on March 5, 2007. That conference occurred on September 7, 2005, when Wilson was arraigned, and Bristow billed one half-hour for that conference. Although not stated in Bristow’s itemization, according to Wilson’s affidavit and letters to Judge Gardner, Wilson also saw Bristow at two hearings and briefly at the jail.[22] The record reveals that Wilson was present at the motion hearings on July 13, 2006, and February 13, 2007. Bristow’s itemization reveals that he billed 8.0 hours on July 13, 2006, for “Motion hearings;” he billed .50 hours on February 13, 2007, for “Appeared at Clerk’s Office w/ Defendant for drawing of Spe. Venire;” and he billed 3.0 hours on February 13, 2007, for “Status Hearing (motions).” Wilson contends that Bristow did not discuss much with him at these hearings, and Wilson’s contention is supported by Bristow’s itemization. Bris-tow’s itemization also reveals that he spent a total of one hour and twenty-four minutes over a period of almost a year and a half, composing eight letters to Wilson. On March 5, 2007, the date of the failed plea hearing, Bristow billed 8.0 hours for *1082 “Plea Hrg. Conference with Court Conference with D.A. Conference with Co-Counsel and Conference with Client.” John-stone’s itemization does not include any conferences with Wilson before the March 5, 2007, failed plea hearing. It also does not include any correspondence with Wilson. On March 5, 2007, Johnstone billed 10.0 hours for “First Plea hearing Round Trip to Tupelo.”[23]
¶ 16. “From counsel’s function as assistant to the defendant derive the overarching duty to advocate the defendant’s cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution” Strickland, 466 U.S. at 688, 104 S.Ct. 2052 (emphasis added); see also Nixon, 543 U.S. at 187, 125 S.Ct. 551 (“An attorney undoubtedly has a duty to consult with the client regarding “important decisions,” including questions of overarching defense strategy.”). A thorough review of the direct-appeal record and the exhibits offered by Wilson in support of his post-conviction-relief motion appear to show that Bristow and Johnstone did not consult with Wilson regarding important decisions and did not keep Wilson informed of important developments. We are unable to find that counsel’s performances were not deficient.
¶ 17. “In the case of a guilty plea, the second prong of prejudice is shown by proving that the ineffective assistance of counsel affected the outcome of the plea process.” Wilson, 21 So.3d at 578 (citing Hill, 474 U.S. at 58, 106 S.Ct. 366); see also Hannah v. State, 943 So.2d 20, 25 (Miss.2006). The transcript of the March 5, 2007, plea-hearing colloquy reveals, in pertinent part:
COURT: Mr. Wilson, are you satisfied with the legal services and the advice given you by your attorneys ?
WILSON: No, sir.
COURT: You are not?
WILSON: No, sir.
COURT: Very well. In what regard?
WILSON: I feel like there could have been more done.
COURT: I’m sorry?
WILSON: I feel like there could have been more done. I don’t think I can receive a fair trial. That’s why I’m taking this plea.
COURT: Mr. Wilson, one of the responsibilities that I have is to ensure that you do get a fair trial.
WILSON: Yes, sir.
COURT: And I will do all within my power to see that that is done.
WILSON: Yes, sir.
COURT: Now, if you tell me that you are not satisfied with the services that your attorneys have given you, I’m not going to accept your plea. You have just got through telling me that, [sic]
WILSON: Yes, sir. I’m not totally satisfied, no, sir I’m not.
COURT: Well, based on the circumstances, I assume they have spent time talking with you about the evidence in this case?
WILSON: Not much.
COURT: Well, all right. Mr. Wilson, I’m returning you to the custody of the [sic] Lee County. This matter will be placed on the docket for trial at a later time.
*1083 DISTRICT ATTORNEY YOUNG: Your Honor, if we can get with you, we would like to pick a date for a trial of this matter in which we will seek the death penalty.
(Emphasis added.) The circuit court refused to accept Wilson’s guilty plea on March 5, 2007, because Wilson had expressed his dissatisfaction with his attorneys and their failure to communicate with him. The State immediately withdrew its sentencing offer of life without parole. In its response, the State admits that “Wilson’s dissatisfaction with his attorneys caused the trial court to refuse to accept his guilty plea....” (Emphasis added.) The record and exhibits appear to show that counsel’s failure to communicate with the client affected the outcome of the plea process. Hill, 474 U.S. at 58, 106 S.Ct. 366. We find this issue to have merit to the extent that Wilson is entitled to an evidentiary hearing in the circuit court.
B. FAILURE TO INVESTIGATE/PREPARE FOR PENALTY PHASE
¶ 18. Wilson argues that counsel did not investigate his case properly and did not properly prepare for the penalty phase.[24] We consistently have held that “at a minimum, counsel has a duty to interview potential witnesses and to make independent investigation of the facts and circumstances of the case.” Ferguson, 507 So.2d at 96; Ross, 954 So.2d at 1005 (citations omitted). Counsel must conduct an independent investigation. Ross, 954 So.2d at 1005 (citing Ferguson, 507 So.2d at 96).[25]
¶ 19. Wilson states that Bristow never talked to him “about possible defenses at the penalty phase. He never asked me for names of friends and family who would be willing to make a case for my life.”[26] Wilson also states that his attorneys did not “discuss the sentencing part of the trial with me. I was unaware of which kind of evidence could be offered at sentencing on my behalf.” Wilson states: “I have subsequently learned that there were many things my attorneys did not do but should have done in order to properly represent me. For instance, they never asked me anything about my background, home life or my childhood.... ”
¶ 20. In the Order for Psychiatric Evaluation, Dr. Lott was ordered to examine Wilson thoroughly and prepare a report for the Court, including “[a]ny and all conditions relevant to mitigation.” Dr. Lott’s report discussed Wilson’s long history of alcohol and drug abuse and noted some “non-statutory mitigating factors.” The report also noted that Dr. Lott was “unable to obtain additional information obtained by the Office of Capital Defense.” He stated that he would provide a supplemental report to the Court if the information was obtained. Andre’ de Gruy states *1084 that Dr. Lott contacted him and requested the social-history information that the OCDC had compiled. He informed Dr. Lott that Wilson’s counsel, Mr. Johnstone, had the information. He “then contacted Mr. Johnstone and discussed the need for him to provide Dr. Lott with this information.” Bristow’s affidavit states: “Since Mr. Johnstone was in charge of mitigation, I assumed Mr. Johnstone was going to follow up with Dr. Lott.” Johnstone’s affidavit states: “I understand that Mr. Wilson was evaluated by Criss Lott, PhD. I don’t recall talking to Dr. Lott or sending him any information about Mr. Wilson. As I recall, Mr. Bristow was going to contact Dr. Lott.” Therefore, neither of Wilson’s counsel communicated with Dr. Lott regarding the missing information he requested. Lott’s report was never supplemented.
¶ 21. In his affidavit, Bristow states that “Johnstone would be responsible for the sentencing phase of Mr. Wilson’s trial.” He also states that Johnstone’s mother was dying in Birmingham and that John-stone was driving back and forth to Birmingham. Bristow finally states that he is “not sure what Mr. Johnstone did to prepare for the penalty phase of the trial.” Johnstone’s affidavit states that he and Bristow “agreed that [Johnstone] would be responsible for calling the witnesses during the sentencing phase of Mr. Wilson’s trial.” Johnstone’s itemization of services in support of his motion for compensation does not include any communication with Wilson to obtain the identities of possible witnesses and does not include any communications with mitigation witnesses.[27] On May 27, 2007, and May 28, 2007 — the days immediately preceding the May 29, 2007, sentencing trial — Johnstone billed a total of four hours for “Preparation for Sentencing Hearing.”
¶ 22. A thorough review of the direct-appeal record and the exhibits offered by Wilson in support of his post-conviction motion appear to show that Bristow and Johnstone conducted virtually no investigation to obtain mitigation evidence. A defendant facing the death penalty has the right to provide the jury with mitigating evidence. Williams, 529 U.S. at 393, 120 S.Ct. 1495. “It is unquestioned that under the prevailing professional norms at the time of [the defendant’s] trial, counsel had an ‘obligation to conduct a thorough investigation of the defendant’s background.’ ” Porter v. McCollum, — U.S. -, 130 S.Ct. 447, 452-453, 175 L.Ed.2d 398 (2009) (quoting Williams, 529 U.S. at 396, 120 S.Ct. 1495). As in Porter, the record and exhibits appear to show that Wilson’s counsel “did not even take the first step of interviewing witnesses or requesting records.” Porter, 130 S.Ct. at 453, 130 S.Ct. 447; State v. Tokman, 564 So.2d 1339 (Miss.1990) (Tokman entitled to new sentencing hearing where counsel spent approximately six hours preparing for the trial; failed to perform any independent investigation; failed to search for any mitigating evidence beyond a discussion with Tokman’s mother; and failed to make sure that Tokman had undergone a psychological examination ordered by the circuit court). If counsel made no reasonable efforts to communicate with Wilson and investigate, then counsel had no hope of knowing what his defenses might be or what his mitigation evidence might be. We find this issue to have merit to the extent that Wilson is entitled to an eviden-tiary hearing in the circuit court.
*1085 ¶ 23. The State argues that Wilson is not entitled to relief, and it relies on Cullen v. Pinholster, — U.S. -, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), and Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011).[28] Cullen and Harrington reaffirm that the test for ineffective assistance of counsel is found in Strickland v. Washington and that counsel’s performance must be reasonable considering all the circumstances. Cullen, 131 S.Ct. at 1403; Harrington, 131 S.Ct. at 787-88. On remand, the circuit court should consider all the circumstances, and resolve all bona fide doubts in favor of Wilson. Chamberlin, 55 So.3d at 1049-1050.
II. WHETHER THE TRIAL COURT HAD A DUTY TO INVESTIGATE APPOINTED COUNSEL’S EFFECTIVENESS AFTER WILSON REPEATEDLY VOICED HIS DISSATISFACTION WITH COUNSEL’S PERFORMANCE, IN ORDER TO PROTECT WILSON’S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS.
¶ 24. Wilson argues that the trial court had a duty to investigate his counsel’s alleged ineffectiveness; that the trial court failed to inquire into Wilson’s complaints about his attorneys; and that such failure violated his constitutional rights. Both Wilson and the State cite the Fifth Circuit’s holding in United States v. Young, 482 F.2d 993 (5th Cir.1973). In Young, the defendant expressed dissatisfaction with his attorney at the beginning of the trial. Id. at 994-95. The Fifth Circuit held: Although an indigent criminal defendant has a right to be represented by counsel, he does not have a right to be represented by a particular lawyer, or to demand a different appointed lawyer except for good cause. See United States v. Sexton, 473 F.2d 512, 514 (5th Cir.1973). Unless a Sixth Amendment violation is shown, whether to appoint a different lawyer for an indigent criminal defendant who expresses dissatisfaction with his court-appointed counsel is a matter committed to the sound discretion of the district court. The Second Circuit has recently summarized the applicable principles:
In order to warrant a substitution of counsel during trial, the defendant must show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict. Brown v. Craven, 424 F.2d 1166 (9th Cir.1970); United States v. Grow, 394 F.2d 182, 209 (4th Cir.), cert. denied, 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968); United States v. Gutterman, 147 F.2d 540 (2d Cir.1945). If a court refuses to inquire into a seemingly substantial complaint about counsel when he has no reason to suspect the bona fides of the defendant, or if on discovering justifiable dissatisfaction a court refuses to replace the attorney, the defendant may then properly claim denial of his Sixth Amendment right. Brown v. Craven, supra. In the absence of a conflict which presents such a Sixth Amendment problem, the trial court has discretion to decide whether to grant a continuance during the course of trial for the sub *1086 stitution of counsel, and that decision will be reversed only if the court has abused its discretion.
Id. at 995 (internal citations omitted) (emphasis added). Wilson points out that his complaints were raised before trial.
f 25. The record reveals that Wilson first informed the trial court of his dissatisfaction with his attorneys in his first letter to Judge Gardner. That letter is undated, but was stamped “filed” by the clerk’s office on March 5, 2007, the date of the failed plea hearing. From the content of the letter and Judge Gardner’s statements about receiving it, it is clear that it was written after January 6, 2007 — the date Wilson was evaluated by Dr. Lott— and before March 5. The trial court was next made aware of Wilson’s dissatisfaction during the failed plea hearing on March 5, 2007. The last time the trial court was informed of Wilson’s dissatisfaction with his counsel was in Wilson’s letter dated May 15, 2007.[29] Each time, Wilson informed the Court that his attorneys were not communicating with him. When Wilson stated, during the failed plea hearing, that his lawyers had not communicated with him, Judge Gardner did not inquire into the matter further. He did not ask counsel to respond to Wilson’s statements.
If 26. The record and pleadings currently before this Court appear to show that counsel did not communicate with Wilson and did not adequately investigate his case. In hindsight, Wilson may have had good cause. Young, 482 F.2d at 995.[30] However, since this matter is being remanded to the circuit court for an evidentiary hearing regarding Wilson’s claims of ineffective assistance of counsel, this issue is now moot.
III. WHETHER THE STATE EXHIBITED PROSECUTORIAL VINDICTIVENESS, THUS VIOLATING WILSON’S CONSTITUTIONAL RIGHTS, BY WITHDRAWING THE PLEA OFFER AFTER THE TRIAL COURT HALTED THE MARCH 5 PLEA HEARING.
¶ 27. Wilson argues that the prosecution’s withdrawal of the sentencing recommendation of life without parole was the result of prosecutorial vindictiveness which violated his constitutional rights. The record reveals that, prior to March 5, 2007, the State agreed that if Wilson pleaded guilty, it would recommend that he be sentenced to life without parole for the capital-murder charge. During the March 5 hearing, Wilson expressed his dissatisfaction with his attorneys, and the trial court refused to accept his plea. The State immediately stated: ‘Your Honor, if we can get with you, we would like to pick a date for a trial of this matter in which we will seek the death penalty.” (Emphasis added.) By letter dated April 9, 2007, the prosecutor confirmed that the plea agreement was withdrawn and that the State would seek the death penalty.
¶ 28. Wilson argues that the only reason the prosecution withdrew the agreement was to punish him for exercising his *1087 right to the effective assistance of counsel. Wilson contends that such conduct violated his rights under the First, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the corresponding sections of the Mississippi Constitution. U.S. v. Goodwin, 457 U.S. 368, 372, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982) (stating that to punish a person because he has done what the law plainly allows him to do is a due-process violation “of the most basic sort”) (quoting Bordenkircher v. Hayes, 434 U.S. 357, 363, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978)). Wilson argues that the only remedy for such prosecutorial vindictiveness is to vacate his death sentence and resentence him to life without parole.
¶29. The record reveals that, at the beginning of the sentencing trial, counsel for Wilson requested that the trial court require the prosecution to put its plea offer “back on the table.” The trial court held:
The Court is of the opinion that this court or no circuit court in the State of Mississippi has any authority to require that the State of Mississippi make or stand by or follow through with any offer that might be terminated on any reasonable grounds.
We find that Wilson has failed to demonstrate prosecutorial vindictiveness. Jordan v. State, 786 So.2d 987, 1001 (Miss.2001); Graves v. State, 492 So.2d 562, 566 (Miss.1986). Thus, Wilson is not entitled to post-conviction relief as to this issue.
IV. WHETHER WILSON’S WAIVER OF A JURY TRIAL AT SENTENCING WAS INVALID DUE TO A LACK OF A KNOWING, INTELLIGENT, AND VOLUNTARY WAIVER, THUS REQUIRING HIS DEATH SENTENCE TO BE VACATED.
¶ 30. Wilson argues that his waiver of a jury during his sentencing trial was not knowing, intelligent, and voluntary. He contends that the waiver was invalid and that his death sentence must be vacated. The Sixth Amendment of the United States Constitution provides that “[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed.... ” U.S. Const. amend. VI; see also Miss. Const, art. 3, § 26. This Court has held that a defendant may waive a jury during sentencing “upon a finding by the trial judge that the defendant’s waiver is knowingly and intelligently made.” Byrom v. State, 927 So.2d 709, 722 (Miss.2006). “Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.” Brady v. U.S., 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (emphasis added). “ ‘A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.’ ” Robinson v. State, 345 So.2d 1044, 1045 (Miss.1977) (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). “The determination of whether there has been an intelligent waiver of [a] right ... must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.” Johnson, 304 U.S. at 464, 58 S.Ct. 1019. Waiver may not be assumed or implied from a silent record. Id. (Courts should indulge every reasonable presumption against waiver of fundamental constitutional rights and should not presume acquiescence in the loss of fundamental rights).
¶ 31. The record reveals that on May 24, 2007, Wilson signed the “Waiver of *1088 Jury for Trial and Sentencing.”[31] That document stated, in pertinent part:
3. I am represented by counsel, Will Bristow and James P. Johnstone, who have conferred with me and advised me as to the nature of the charges against me, which I understand, and who have fully advised me of my rights in the premises, and I am freely and voluntarily executing this waiver with their approval and counsel and upon their advice.
4. I understand that I am entitled to have this matter presented to a lawfully constituted jury of the county for determination as to my guilt....
5. I understand that I am entitled to have a sentencing hearing or proceeding on the capital murder charge in the Indictment before a jury empaneled for the purpose of determining the sentence I shall receive, pursuant to Section 99-19-101 of the Mississippi Code of 1972, as amended. I hereby expressly waive my right to a jury for sentencing in this cause and hereby agree that the Honorable Thomas J. Gardner, III, Circuit Judge for the First Circuit Court District of the State of Mississippi, may conduct the sentencing hearing and sentence me in this matter without a jury.
During the hearing on May 24, 2007, the trial court examined Wilson regarding his guilty plea and the “Waiver of Jury for Trial and Sentencing.” The transcript contains the following colloquy:
COURT: All right. I am advised by your attorneys, and we’re going to talk about this more shortly, but that you desire and have executed a Waiver of a Trial by Jury, not only in the guilt phase which we’re now winding up, but also in the sentencing phase.
WILSON: Yes, sir.
COURT: I have in my possession a document, a two-page document purporting to be signed by you today, signed in the presence or acknowledged before Darla Moses. I’m going to exhibit that to you.
Mr. Bristow, if you will let him look at that.
(BRIEF PAUSE IN PROCEEDINGS)
WILSON: Yes, sir.
COURT: All right. And did you in fact sign that document?
WILSON: Yes, sir.
COURT: Do you understand what that means, that there will be no jury who will hear evidence in connection with the sentencing phase of this case; that jury will not — there will not be a jury to make a decision about the sentence to be imposed; that I, having heard whatever evidence is presented by you and the State, will determine an appropriate sentence to be imposed in this ease in each count.
WILSON: Yes, sir.
COURT: And do you understand that the jury and I, as the Court without a jury, can impose any sentence in the capital murder charge, Count I, including death, life imprisonment without possibility of parole, life in the custody of the Mississippi Department of Corrections, and that those are the choices that I will have and that the jury would have. Do you understand that?
WILSON: Yes, sir.
*1089 COURT: But that I will solely make that determination now. Do you understand that?
WILSON: Yes, sir.
COURT: Now — yes, sir?
MR. YOUNG: Your Honor, I don’t mean to raise anything, but I was thinking under — if he pleads guilty to capital murder, under the statute his choices are death or life without parole.
COURT: I think that is correct, Counsel.
Mr. Wilson, I might have misspoken. I think that the Court is then faced with imposing death or life without parole. Do you understand that?
WILSON: Yes, sir.
COURT: All right. I misspoke when I included life in that.
Now, because I want to be certain that you fully understand and appreciate what is happening in your entering a plea of guilty to these charges, it’s been several days now, some 30, 40 days ago when the first part of this took place, do you have a clear recollection and understanding of what took place on that occasion?
WILSON: Yes, sir.
COURT: Because if there’s anything about this you don’t understand, I am willing and we’ll go back and we’ll go through it from the very beginning. WILSON: I fully understand.
COURT: All right, sir. You understand, too, that there is no recommendation made by the State. That has been withdrawn.
WILSON: Yes, sir.
COURT: That I am not committed to any particular sentence to be imposed one way or the other, either murder— on the capital murder charge, death or life without parole.
WILSON: Yes, sir.
(Emphasis added.)
¶ 32. Wilson contends that his attorneys “assured him that he would not be sentenced to death if he waived a sentencing jury.” He contends that Bristow told him, in the presence of his family, that Judge Gardner could not legally sentence him to death if he waived the jury. He states that neither attorney informed him that Judge Gardner had sentenced two other defendants to death after they had waived sentencing juries. Wilson also states that the “Waiver of Jury for Trial and Sentencing” did not inform him that it would require a unanimous jury of twelve individuals in order for a jury to sentence him to death. Wilson additionally states that the trial court never informed him of this fact. Wilson argues that he was not properly informed by the court or his attorneys of the “relevant circumstances and likely consequences” of his waiver.
¶ 33. Wilson’s affidavit states, in pertinent part:
14. In May 2007, Mr. Bristow told me over and over that pleading guilty was the only option. He said a jury would sentence me to death. Mr. Bristow told me the Judge would not sentence me to death. I felt like my best chance for life was to plead in front of Judge Gardner. I had tried everything I knew to do. I wrote my lawyers, the Bar, and the Judge but nothing was accomplished. I was concerned because the agreement was no longer on the table. If I had lawyers who were working on my behalf, I would have taken my chances at a trial since the deal was off the table. I went ahead with the plea because Mr. Bristow told me in front of my mother and stepfather, *1090 Dale McGhee, that Judge Gardner could not legally sentence me to death without a jury. I had no hope, and I felt that I had no choice but to plead guilty.
15. When asked by the Court at the second guilty plea hearing which took place on May 24, 2007, if I was satisfied with the services of my attorney, I responded that I was satisfied. I had been assured by my attorneys that Judge Gardner would not sentence me to death if I plead [sic] guilty and waived a jury.
16. I have subsequently learned that there were many things my attorneys did not do but should have done in order to properly represent me. For instance, they never asked me anything about my background, home life, or my childhood, nor did they, or anyone else for that matter, tell me that Judge Thomas J. Gardner, III had previously sentenced one or more defendants to death upon their waiver of a jury to determine their sentences. If I had known Judge Gardner had previously sentenced other defendants to death upon their waiver of a jury to determine their sentences, I would have never consented to waive a jury as to guilt or sentencing.
(Emphasis added.) In his affidavit, Bris-tow stated: “I never counseled Mr. Wilson that Judge Gardner had previously imposed a death sentence on waiver of a jury for sentencing in a capital case. I was not aware of Judge Gardner’s sentencing record.” In his affidavit, Johnstone stated: “I do not recall counseling Mr. Wilson that Judge Gardner had previously imposed a death sentence on waiver of a jury for sentencing in a capital case.”[32]
¶34. Wilson’s argument that he was never informed “that it would take a unanimous jury of twelve individuals in order for a jury to sentence him to death” is without merit. The record reveals that during the plea colloquy on March 5, 2007, the trial court informed Wilson that if he went to trial before a jury, all twelve jurors would have to agree as to his guilt and to his sentence. During the plea colloquy on May 24, 2007, the trial court asked Wilson if he had a “clear recollection and understanding of what took place” during the March 5, 2007, hearing. Wilson responded that he “fully” understood.
¶ 35. Wilson contends that his attorneys told him that Judge Gardner could not sentence him to death. Even if Wilson’s attorneys incorrectly told him that Judge Gardner could not legally sentence him to death, during the plea colloquy on May 24, 2007, Judge Gardner informed Wilson several times that he could sentence him to death. This argument is without merit.
¶ 36. Wilson argues that his attorneys failed to inform him that Judge Gardner had sentenced defendants to death after they had waived juries for sentencing. Bristow and Johnstone’s affidavits support Wilson’s argument, and the State does not offer any evidence to refute it. Wilson states that he would not have agreed to waive his sentencing jury had he known that Judge Gardner had sentenced others to death after they had waived sentencing juries. In fact, Judge Gardner has at least twice imposed death sentences after the defendants waived the jury for sentencing. Byrom v. State, 863 So.2d 836 *1091 (Miss.2003); Loden v. State, 971 So.2d 548 (Miss.2007). Both were sentenced before Wilson’s sentencing proceeding. James P. Johnstone was one of Loden’s trial attorneys. Id. at 553. We find this issue to have merit to the extent that Wilson is entitled to an evidentiary hearing in the circuit court. The circuit court should determine if that court’s sentencing record in this type of proceeding was relevant and revealed likely consequences of the proceeding. The circuit court must determine if Wilson has shown that he did not have “sufficient awareness of the relevant circumstances and likely consequences” and that his waiver was not knowingly, intelligently, and voluntarily entered. Brady, 397 U.S. at 748, 90 S.Ct. 1463.
¶ 37. Additionally, the circuit court must determine if Wilson’s waiver was procedurally flawed and, therefore, invalid. Miss.Code Ann. § 99-19-101(1) (Rev.2007). This Court has held that a defendant may waive a jury during sentencing “upon a finding by the trial judge that the defendant’s waiver is knowingly and intelligently made.” Byrom, 927 So.2d at 722 (Emphasis added). The record is silent on this issue. Courts should indulge every reasonable presumption against waiver of fundamental constitutional rights and should not presume acquiescence in the loss of fundamental rights. Johnson, 304 U.S. at 464, 58 S.Ct. 1019.
V. WHETHER TRIAL COUNSEL WAS INEFFECTIVE DUE TO A FAILURE TO PREVENT OR PRESERVE OBJECTION TO PROSECUTORIAL VINDICTIVENESS, IMPROPER WAIVER OF A JURY AND FAILURE TO PRESENT AVAILABLE MITIGATION EVIDENCE.
¶ 38. Wilson argues that his trial counsel rendered constitutionally ineffective assistance of counsel when they failed to object to prosecutorial vindictiveness, when they persuaded him to waive the sentencing jury, and when they failed to investigate and present available mitigation evidence.
A. FAILURE TO OBJECT
¶ 39. Wilson argues that his trial counsel were constitutionally ineffective when they failed to timely object to prosecutorial vindictiveness. As discussed in Issue III above, Wilson has failed to demonstrate prosecutorial vindictiveness. Even if counsel had objected on March 5, 2007, to the State’s withdrawal of the sentencing agreement, we find that the trial court properly would have overruled the objection. Wilson cannot show that counsel’s performances were deficient and, therefore, cannot meet both prongs of the test in Strickland, 466 U.S. at 687, 104 S.Ct. 2052. For these reasons, we find Wilson is not entitled to post-conviction relief as to this issue.
B. WAIVER OF SENTENCING JURY
¶ 40. Wilson argues that, after much persistence, his trial counsel persuaded him to waive his right to a jury during sentencing, but that counsel failed to inform him that Judge Gardner had sentenced other defendants to death after they had waived their sentencing juries. Wilson argues that his counsel rendered constitutionally ineffective assistance of counsel which invalidates his waiver of a sentencing jury.
¶ 41. Wilson states that “[i]n May 2007, Mr. Bristow told me over and over that pleading guilty was the only option. He said a jury would sentence me to death. Mr. Bristow told me that the Judge would not sentence me to death.” Wilson also states:
*1092 I have subsequently learned that there were many things my attorneys did not do but should have done in order to properly represent me. For instance, they never asked me anything about my background, home life, or my childhood, nor did they, or anyone else for that matter, tell me that Judge Thomas J. Gardner, III had previously sentenced one or more defendants to death upon their waiver of a jury to determine their sentences. If I had known Judge Gardner had previously sentenced other defendants to death upon their waiver of a jury to determine their sentences, I would have never consented to waive a jury as to guilt or sentencing.
(Emphasis added.) In his affidavit, Bris-tow states that he was “operating on the assumption” that Judge Gardner would honor the original sentencing recommendation and that he “advised Mr. Wilson that his best chance of a life sentence was to plea in front of Judge Gardner.” However, Bristow admits that he never attempted to find out Judge Gardner’s sentencing record in similar situations and he admits that he never informed Wilson that Judge Gardner previously had sentenced other defendants to death after they had waived their sentencing juries. In his affidavit, Johnstone states that he was operating under the same assumption as Bristow and he too did not inform Wilson of Judge Gardner’s sentencing record.
¶42. As has already been discussed above, “[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.” Padilla, 130 S.Ct. at 1482 (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052). The United States Supreme Court has “long ... recognized that ‘[prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable....’” Id., (citations omitted). Under ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, “counsel should know and fully explain to the client: ... the practices, policies and concerns of the particular jurisdiction, the judge and prosecuting authority....” ABA Guideline 10.9.1.B.7. “From counsel’s function as assistant to the defendant derive the overarching duty to advocate the defendant’s cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.” Strickland, 466 U.S. at 688, 104 S.Ct. 2052 (emphasis added). “[I]n order to satisfy the ‘prejudice’ requirement [of Strickland ], the defendant must show that there is a reasonable probability that, but for counsel’s errors, he would not have pleaded guilty and would have insisted on going to trial.” Hill, 474 U.S. at 59, 106 S.Ct. 366.
¶ 43. It takes no amount of deductive reasoning to conclude that counsel would be unable to inform his client about the likelihood of a particular sentence from a particular judge when counsel has never attempted to research the topic. Wilson’s counsel advised him that his best chance at avoiding the death penalty was to waive his sentencing jury, but counsel failed to inform Wilson that Judge Gardner already had sentenced two other defendants to death after they had waived their sentencing juries. We find this issue to have merit to the extent that Wilson is entitled to an evidentiary hearing in the circuit court.
C. FAILURE TO INVESTIGATE AND PRESENT MITIGATION EVIDENCE
¶ 44. Wilson argues that his trial counsel failed to investigate and present avail *1093 able mitigation evidence, and that because of counsel’s ineffectiveness, the available evidence which most likely would have been persuasive to the trial court was not presented. Wilson’s counsel called only three witnesses to present brief mitigation evidence. He contends that counsel failed to interview available witnesses and failed to present evidence of his social history. Wilson states that counsel did not present any evidence of the effects of addiction to counteract the large amount of testimony elicited by the State regarding Wilson’s alcohol and drug use. Wilson states that, although counsel had Wilson evaluated by Dr. Lott, no further evaluations were performed to determine if Wilson had brain dysfunction or brain damage. Wilson states that counsel failed to present any evidence regarding his adaptability to prison.
¶ 45. As already has been discussed in Issue I, a thorough review of the direct-appeal record and the exhibits offered by Wilson in support of his post-conviction-relief motion appear to show that Bristow and Johnstone conducted virtually no investigation to obtain mitigation evidence. A defendant facing the death penalty has the right to provide the jury with mitigating evidence. Williams, 529 U.S. at 393, 120 S.Ct. 1495. “It is unquestioned that under the prevailing professional norms at the time of [the defendant’s] trial, counsel had an ‘obligation to conduct a thorough investigation of the defendant’s background.’ ” Porter, 130 S.Ct. at 452-53 (quoting Williams, 529 U.S. at 396, 120 S.Ct. 1495). The record and exhibits appear to show, as in Porter, that Wilson’s counsel “did not even take the first step of interviewing witnesses or requesting records.” Porter, 130 S.Ct. at 453. If counsel made no reasonable efforts to communicate with Wilson and investigate, then counsel had no hope of knowing what his defenses might be or what his mitigation evidence might be. We are unable to find that counsel’s performances were not deficient.
¶ 46. In order to show ineffective assistance of counsel, Wilson also must show that, because of counsel’s deficient performance, the defense was prejudiced. Strickland, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Wilson “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. at 694.
¶ 47. Wilson first presents affidavits from two additional character witnesses who state that they would have testified on Wilson’s behalf. Wilson’s stepfather states that:
I was never asked by Willie’s lawyers to testify on his behalf at his sentencing, even though I was willing and available to testify on his behalf. There was a lot of information regarding Willie that I could have testified to at sentencing. Among other things, I could have testified that Willie was not a violent person, that the crime for which he was convicted was totally out of character for him, and that he was very loving and caring [with] his younger brother Mason who looked up to Willie.
Wilson’s school football coach stated that he was very familiar with Wilson, had spent a lot of time with him, and was willing to testify. He described Wilson as intellectually “slow” and unable to grasp the intricacies of the game and said he had difficulty learning the plays. He described Wilson’s family problems and explained that he would often have to drive Wilson home because none of the family members would pick Wilson up or answer his phone calls. He states that he believes that Wil *1094 son “suffered from a lack of love and attention.”
¶ 48. Wilson next presents the affidavit of James J. Kramer, M.D., Ph.D., a licensed physician in Mississippi, a certified member of the American Society of Addiction Medicine, and a Diplómate with the American Board of Addiction Medicine. Dr. Kramer opines that a proper diagnosis for Wilson would include alcohol dependence, cannabis dependence, methamphetamine dependence, and cocaine dependence. Dr. Kramer states that he could have testified at Wilson’s trial “to help explain the devastating effect that Mr. Wilson’s drug and alcohol use had on his life, how he suffered greatly as a result from their use, and that the Court should consider viewing it as a factor in deciding whether or not to sentence Mr. Wilson to death.” Wilson also points out that Dr. Lott’s report contained quite a bit of information regarding his alcohol and drug use, however, counsel made no effort to put on any evidence regarding the mitigating nature of Wilson’s drug and alcohol addiction. This Court has recognized that drug use can be mitigating in a capital case. Wilcher v. State, 868 So.2d 776, 803 (Miss.2003); Bell v. State, 360 So.2d 1206, 1212 (Miss.1978). The United States Supreme Court has pointed out the mitigating nature of drug abuse by a capital defendant. Cone v. Bell, 556 U.S. 449, 129 S.Ct. 1769, 1786, 173 L.Ed.2d 701 (2009). This evidence could have countered the argument made by the State and would have provided a basis for the trial court to consider the mitigating nature of Wilson’s drug and alcohol addiction which “may well have been material to the [court’s] assessment of the proper punishment in this case.... ” Id.
¶ 49. Wilson also presents the affidavit of Dr. Tora Brawley, a licensed neuropsy-chologist who evaluated Wilson in November 2010. Dr. Brawley states:
It is my opinion, based on a reasonable degree of psychological certainty, that the testing revealed the presence of several areas of neuropsychological deficit. These deficits were primarily subcortical in nature. He evidenced frontal lobe deficits which can cause a multitude of difficulties to include impulsivity, poor judgment, inability to fully comprehend consequences, etc.
(Emphasis added.) Dr. Brawley noted Wilson’s extensive drug and alcohol use and his history of prior head injuries. She states that “[t]he current results of my evaluation reveal the presence of scattered neuropsychological deficits consistent with subcortical and frontal lobe brain impairment.” (Emphasis added.) The United States Court of Appeals for the Sixth Circuit has stated that “while juries tend to distrust claims of insanity, they are more likely to react sympathetically when their attention is drawn to organic brain problems....” Glenn v. Tate, 71 F.3d 1204, 1211 (6th Cir.1995). The United States Court of Appeals for the Tenth Circuit has found that mitigating evidence of a defendant’s mental retardation, brain damage, and troubled background “is exactly the sort of evidence that garners the most sympathy from jurors.” Smith v. Mullin, 379 F.3d 919, 942 (10th Cir.2004).
¶ 50. Finally, Wilson presents the affidavit of James E. Aiken, who maintains a consulting firm regarding issues related to prison and jail confinement. Relying on Skipper v. South Carolina, this Court has held that “evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating.” Jordan v. State, 518 So.2d 1186, 1188 (Miss.1987) (see also Skipper, 476 U.S. 1, 4-5, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986)).
The exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury’s ability to carry out *1095 its task of considering all relevant facets of the character and record of the individual offender. The resulting death sentence cannot stand, although the State is of course not precluded from again seeking to impose the death sentence, provided that it does so through a new sentencing hearing at which petitioner is permitted to present any and all relevant mitigating evidence that is available.
Id. (quoting Skipper, 476 U.S. 1, 8-9, 106 S.Ct. 1669, 90 L.Ed.2d 1) (emphasis added). Aiken, who has testified as an expert in several states, including Mississippi, states that he examined various records regarding Wilson and interviewed Wilson in November 2010. Aiken states, in pertinent part:
Based upon a reasonable degree of certainty, Mr. Wilson does not present as an unusual risk to correctional staff and other inmates while properly confined and managed in a secured confinement environment. This finding remains after analysis and consideration of Mr. Wilson’s criminal history and pre-conviction confinement records. Based upon the above referenced qualifications and review of the materials stated above, it is apparent that Mr. Wilson’s lack of significant criminal history and his pre-conviction confinement record do not reflect a pattern of a prison predator, nor is there evidence of his continual, methodical use of violence and power to gain control over inmates, staff, or the operation of the confinement facility. Rather, the information indicates that the confinement system and the staff managed his security needs in an acceptable manner.
[[Image here]]
It is my opinion, based upon a reasonable degree of certainty, that Mr. Wilson can be safely sanctioned to prison confinement for life without the possibility of parole. This removes the importance of the need for the prison system to prepare him for return to society.... It is also my opinion to a reasonable degree of certainty that Mr. Wilson does not pose a danger of escape or violence to prison personnel or other inmates. Mr. Wilson can be safely confined within a secure confinement facility for the remainder of his life and the specific agency responsible can properly manage him.
Aiken states that he was available to evaluate Wilson and testify on his behalf at his trial, had he been asked.
¶ 51. If trial counsel did not properly investigate the case, then counsel could not have properly advised Wilson regarding his options, because they could not have fathomed what his options truly were. Counsel’s entire mitigation case consisted of the brief testimony of three character witnesses, and the testimony of one of these witnesses was “picked apart” by the State using Dr. Lott’s report, which was incomplete, since Dr. Lott never received the requested information from Wilson’s trial counsel. Wilson, 21 So.3d at 580-88. Dr. Lott’s report was used by the State to emphasize Wilson’s drug use in an effort to rebut the statutory mitigating circumstance that Wilson had no significant history of prior criminal activity. Dr. Lott was ordered to thoroughly examine Wilson and provide a report regarding “[any] and all conditions relevant to mitigation.” Because Bristow and Johnstone failed to provide the additional information that he requested, Dr. Lott was unable to complete his report regarding mitigation evidence. Wilson contends that quite a bit of mitigation evidence existed at the time of his sentencing trial. Wilson argues that counsel failed to investigate his case, so they failed to discover and present any of this mitigation evidence. “In the instant case, it is undisputed that [the defendant] had a right — indeed, a constitutionally protected right — to provide the jury with the mitigating evidence that his trial counsel ei *1096 ther failed to discover or failed to offer.” Williams, 529 U.S. at 393, 120 S.Ct. 1495. Thus, we are unable to find that counsel’s performances were not deficient.
¶ 52. “[T]he Constitution requires that ‘the sentencer in capital cases must be permitted to consider any relevant mitigating factor.’ ” Porter, 130 S.Ct. at 454-55 (quoting Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)). In Porter, the Court recognized the mitigation value of evidence showing the existence of a brain abnormality and cognitive defects. Id. at 455. “It is unreasonable to discount to irrelevance the evidence of [the defendant’s] [mitigation evidence], especially when that kind of history may have particular salience for a jury evaluating [the defendant’s] behavior.... ” Id. “We do not require a defendant to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Id. at 455-56 (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052). Previously, this Court has had occasion to find prejudice and has concluded that trial counsel was ineffective where counsel failed “to make the most of the available evidence in mitigation....” Woodward v. State, 635 So.2d 805, 810 (Miss.1993). Accordingly, we find this issue to have merit to the extent that Wilson is entitled to an evi-dentiary hearing in the circuit court.
VI. WHETHER THE CUMULATIVE EFFECT OF ERRORS PRESENT IN THIS CASE HAVE DENIED WILSON HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.
¶ 53. Wilson argues that the cumulative effect of the errors in his case cannot be harmless. He argues that:
[w]hen reviewing the prejudicial impact of the multitude of egregious errors that occurred in Mr. Wilson’s case, the Court should note that the sentencing hearing did not meet the exacting standards of reliability required by the United States and Mississippi Constitutions. Mr. Wilson is not asserting the right to a “perfect trial,” though the sentencing hearing he received was far from perfect, but he is asserting his right to a sentencing hearing which had some chance of providing the heightened reliability demanded in capital cases.
Wilson argues that his sentence of death should be reversed and vacated. Alternatively, he requests that this matter be remanded for an evidentiary hearing. As discussed above, we find that Wilson has established that he is entitled to an eviden-tiary hearing on several grounds; therefore, we need not discuss the perceived cumulative effect of errors in today’s case.
CONCLUSION
¶ 54. “[T]he gravity of a death penalty case demands that we sanction a conviction and sentence only where there are no genuine doubts as to their validity.” Ross, 954 So.2d at 1019 (internal citations omitted). Contrary to the arguments of the State, even a murderer is entitled to the effective assistance of counsel. Wilson’s Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief is denied in part and granted in part. Wilson is entitled to an evidentia-ry hearing on his claims that his trial counsel did not properly communicate with him; that his trial counsel did not properly investigate the case; that his trial counsel did not prepare for the penalty phase; that his trial counsel did not present adequate mitigation evidence; and that his *1097 trial counsel did not adequately prepare for Wilson’s case, including researching the consequences of a defendant’s waiver of a jury at sentencing. Wilson also is entitled to an evidentiary hearing on his claims that his waiver of a jury during his sentencing trial was not knowingly, intelligently, and voluntarily entered and whether that waiver was procedurally flawed. As to the remaining issues, Wilson’s motion for post-conviction collateral relief is denied. Any post-conviction pleadings filed on behalf of William Matthew Wilson shall be filed in the Lee County Circuit Court on or before thirty days after the issuance of this Court’s mandate, and the circuit court shall enter scheduling orders consistent with the deadlines set out in Rule 22(c)(6) of the Mississippi Rules of Appellate Procedure.
¶ 55. POST-CONVICTION COLLATERAL RELIEF IS GRANTED IN PART AND DENIED IN PART.
WALLER, C.J., RANDOLPH, LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. KITCHENS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KING, J.

. Wilson's separate petition seeking post-conviction collateral relief, regarding the guilty plea, is pending in the circuit court.

. He also stated that he and Malorie's mother did not think Malorie's injuries were that bad. Malorie's mother pleaded guilty to failing to obtain medical attention for Malorie and to accessory after the fact to capital murder.

. Although not the proper subject of this post-conviction relief motion, the State discusses the separate child-abuse conviction throughout its response. The State misstates that Malorie's feet and legs were burned. The record reveals that Malorie’s feet were severely burned, but her legs were not burned.

. Wilson stated that he and Malorie's mother stayed up most of the night putting ice packs on Malorie’s head. Wilson stated that, around four in the morning, he went to sleep for about an hour. He woke around five in the morning, and Malorie was breathing. He checked her again around six and discovered she was not breathing. He tried to administer CPR and he called 911.

. At the conclusion of the failed plea hearing on March 5, 2007, the district attorney stated: "Your Honor, if we can get with you, we would like to pick a date for a trial of this matter in which we will seek the death penalty." (Emphasis added.) By letter dated April 9, 2007, the district attorney informed Wilson's counsel that the previous sentencing offer was withdrawn and that the State would seek the death penalty.

. Bristow filed Wilson’s Notice of Appeal, Designation of Record, and Certificate of Compliance. On August 10, 2007, Bristow entered his appearance in this Court. A briefing schedule was set and Wilson’s principal brief originally was due on December 26, 2007. Bristow failed to file that brief and failed to timely seek an extension of that deadline. Instead, on January 10, 2008, Bristow filed a procedurally flawed motion to withdraw as counsel and motion for additional time to file Wilson's brief. By order entered on January 23, 2008, this Court dismissed the flawed motion and ordered Bris-tow to show cause why sanctions should not be imposed for his failure to take action to protect Wilson's rights. Bristow responded and Andre' de Gruy entered an appearance on behalf of Wilson. The Court determined that sanctions should not be imposed against Bristow and granted his motion to withdraw.

. Wilson’s claims that his attorneys were ineffective in failing to properly investigate the case and in failing to prepare for the penalty phase are also addressed in the discussion of Issue V.

. See also Rompilla v. Beard, 545 U.S. 374, 387, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

. The State did not submit any affidavits or other documents in support of its response. Therefore, the State has not offered any evidence to rebut the information found in the appellate record or the evidence found in Wilson’s post-conviction motion.

. The record reveals that Laher filed "Defendant’s Motion for Investigative Expenses.” Bristow argued this motion on July 13, 2006. The trial court pointed out that the motion did not include any specific requests and he was "not going to just write you a blank check.” The trial court encouraged Bristow to "approach [the court] ex parte to explain the need.” The trial court was willing to grant reasonable expenses, however, Bristow never pursued the matter. Therefore, contrary to Bristow’s statement in the letter, the motion for funds to pay an investigator was never granted.

. The record reveals that Bristow never filed a motion requesting that the Office of Capital Defense Counsel be appointed to assist with Wilson’s case. Andre' de Gruy stated in his affidavit that he "advised Mr. Bristow that [OCDC] could not make an appearance in a case with a pending trial date. I advised him that he should request a continuance and/or the appointment of the office.” (Emphasis added.)

.Wilson's first letter to Judge Gardner is undated, but was stamped "filed” by the clerk’s office on March 5, 2007, the date of the failed plea hearing. From the content of the letter and Judge Gardner’s statements about receiving it, it is clear that it was written after January 6, 2007 — the date Wilson was evaluated by Dr. Lott — and before March 5.

. This portion of the affidavit is not based on Wilson’s personal knowledge.

. This letter is dated May 15, 2007, but does not bear a “filed” stamp from the clerk’s office. Both of Wilson's letters were contained in the appellate record and discussed in Wilson, 21 So.3d at 578-80.

.The record reveals that Wilson was arraigned on September 7, 2005. Bristow filed a short motion for discovery the next day. Three months later, Bristow filed a motion for the appointment of additional counsel. Between December 2005 and July 10, 2006, the few motions filed on Wilson’s behalf were *1079 filed by Laher. By order entered on April 24, 2006, the trial was set to begin on August 21, 2006. Bristow did not file any pleadings on Wilson's behalf until July 12, 2006. Those motions were in response to the "Order Compelling Defendant’s Compliance with the Court’s Scheduling Order,” which required the filing of all motions immediately. The motions were heard on July 13, 2006. During that hearing, Bristow acted as if he was substituting for Laher instead of acting as Wilson’s lead attorney.

. Johnstone’s time records do not show any communication — in person, by phone, or by letter — with Wilson before the failed guilty-plea hearing on March 5, 2007.

. Dr. Lott’s report states: "It should be noted that I have been unable to obtain additional information obtained by the Office of Capital Defense. If I obtain additional information I will provide a supplemental report to the Court.” Andre' de Gruy's affidavit states that Dr. Lott contacted him and requested the social history information that his office had compiled. He informed Dr. Lott that, because he "was not representing William Wilson I could not provide him a copy of the file but that I had provided a copy of the file to Mr. Johnstone.” Mr. de Gruy then contacted Johnstone and "discussed the need for him to provide Dr. Lott with this information.”

.Bristow never filed a motion to suppress Wilson’s statements. Laher filed a brief motion to suppress. The motion was brought up for hearing on July 13, 2006, and again on February 13, 2007, but Bristow never put on any evidence or made any argument in support of it. The judge never denied the motion to suppress the confession. After hearing some evidence regarding the motion, the court recessed the hearing because one of the law enforcement officers was unavailable. The judge stated that he believed that he would probably deny the motion, but wanted to hear the remaining officer's testimony. No order denying the motion is found in the record.

. The affidavit is dated May 20, 2008, so “last January” would be January 2008.

. See supra note 17.

. Actually, Judge Gardner has at least twice imposed death sentences after the defendants waived the jury for sentencing. Byrom v. State, 863 So.2d 836 (Miss.2003); Loden v. State, 971 So.2d 548 (Miss.2007). Both were sentenced before Wilson's sentencing proceeding. James P. Johnstone was one of Lo-den's trial attorneys. Id. at 553.

. Wilson states that they met "once at the jail before I was sent to Jackson and that was only to inform me that I was to go to Jackson on the sixth of January for an evaluation.” Wilson was evaluated by Dr. Lott on January 6, 2007.

. The State incorrectly asserts that "Wilson’s attorneys met with him at least five times, according to time sheets, one time for eight hours; trial counsel wrote seven letters to Wilson." The record does not support the State’s assertion.

. See infra discussion of Issue V.

. Andre' de Gruy’s affidavit states:
I understand that in early 2007 the prosecutor offered to drop the death penalty and accept a sentence of life imprisonment without possibility of parole in exchange for a plea of guilty to capital murder. At this point it was incumbent upon defense counsel [to] explain to the client the weaknesses of possible defenses, discuss the advantages of reaching an agreement with the prosecutor, and evaluate the risks of going to trial. This cannot be done without first conducting a thorough investigation.... The process of preparing a client to accept an agreed-upon disposition often takes considerable time, and thus counsel must be in frequent contact with the client to discuss the course of the investigation and the status of the case.

.Three witnesses testified during the penalty phase. None asked the judge to spare Wilson’s life and none asked for mercy.

. Wilson’s mother states that she and the other mitigation witnesses did not meet with Bristow and Johnstone regarding their mitigation testimony until the second day of the sentencing trial. She states that the meeting was brief and their testimony was "only discussed in the most general of terms.”

. The State also relies on Crawford v. State, 867 So.2d 196, 207 (Miss.2003). However, Crawford did not allege that his counsel failed to communicate with him, and he raised only a very general allegation that his counsel did not adequately investigate his case. Id. at 207-208. Therefore, Crawford is distinguishable from the present case.

. Wilson's mother also states that she wrote a letter to Judge Gardner expressing concerns about counsel’s conduct. Nothing in the record or the documents supporting the post-conviction-relief motion indicates whether Judge Gardner ever received that letter.

. Had the trial court asked counsel to respond to Wilson’s statements during the failed plea hearing, this case may have proceeded down a different path. However, the trial court did not have the benefit of many of the documents currently before this Court. Far too often, defendants falsely claim that their attorneys are not communicating with them. To require trial courts to halt proceedings to conduct a hearing regarding all of those claims would place a great burden on our limited judicial resources.

. Section 99-19-101(1) of the Mississippi Code allows the sentencing proceeding to be conducted before the trial judge sitting without a jury if both the State and the defendant agree in writing. The record does not contain a written waiver executed by the State. The general docket does not indicate that such a document was filed.

. The attorneys’ conduct regarding the waiver of the sentencing jury is discussed in greater detail in Issue V.